**William LLOYD and Kathaleen McCormick, Plaintiffs,**

v.

**Richard JEFFERSON, William McDaniel, and William Hill, Defendants.**

**No. Civ.A. 97–307–GMS.**

United States District Court, D. Delaware.

May 12, 1999.

Catherine T. Hickey and Noel E. Primos, of Schmittinger & Rodriguez, Dover, Delaware, for plaintiffs.

Marc P. Niedzielski and Kevin P. Maloney, of the Department of Justice, State of Delaware, Wilmington, Delaware, for defendants.

## *OPINION*

SLEET, District Judge.

### INTRODUCTION

Kathaleen McCormick ("McCormick" or "plaintiff") was a contract employee with the Department of Public Instruction of the State of Delaware ("DPI"). Sgt. N. Richard Jefferson ("Jefferson"), Capt. William McDaniel ("McDaniel"), and Chief William Hill ("Hill") (collectively "defendants") are employees of the Department of Natural Resources and Environmental Control of the State of Delaware ("DNREC").

Plaintiff also served as a corporate officer for an entity that held leases in a mobile home park in Sussex County, Delaware. A complaint was apparently received concerning an open septic system at the mobile home park. An investigation was initiated by defendant Jefferson. It was in this regard that McCormick and Jefferson had their initial contact. This contact did not go especially well, and to understate what will later become apparent, matters went increasingly downhill from there.

Indeed, Jefferson's supervisor, defendant McDaniel, initiated a second contact with plaintiff which lead to additional contacts between McDaniel's supervisor, defendant Hill, and plaintiff's supervisor, Valerie Woodruff. The *ultimate* contact occurred in the rear parking area of the Bridgeville Police Department in Bridgeville, Delaware, when—as a result of an incident related to the mobile home park and DNREC's regulatory responsibilities but unrelated to the septic system complaint—Jefferson was in the process of effecting the arrest of McCormick's father, William Lloyd.[1]

This action stems in part from plaintiff's contention that during that arrest, Jefferson physically accosted her in order to prevent her from using a video camera to record the event and to prevent her from entering into the police station with her father. Plaintiff asserts that all the defendants conspired to have defendant Jefferson assault and detain her. Plaintiff also contends that, as a result of another conspiracy among the defendants, she lost her contract with the DPI.

Plaintiff has filed this action seeking from defendants, among other forms of relief, compensatory and punitive damages. Plaintiff alleges that, during their confrontation, Jefferson unlawfully seized her and, in the process, used excessive force in violation of 42 U.S.C. § 1983[2] pursuant to rights secured by the Fourth and Fourteenth Amendments[3] of the United States Constitution. In addition, plaintiff alleges that defendants violated 42 U.S.C. §§ 1985[4] and 1986[5] by conspiring to deprive her of equal protection of the law based upon her gender and to deprive her of rights guaranteed by the First Amendment of the United States Constitution. Plaintiff also claims violations of various rights secured by state law. The court has jurisdiction over the federal statutory and constitutional claims pursuant to 28 U.S.C. §§ 1331 and 1343. The court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

1. William Lloyd since has voluntarily withdrawn his claims against defendants.

2. 42 U.S.C. § 1983 states: Every person who, under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

3. The Fourth Amendment applies to the conduct of state officials, by incorporation into the Fourteenth Amendment. *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

4. 42 U.S.C. § 1985(3), in pertinent part, states: If two or more persons in any State or Territory conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

5. 42 U.S.C. § 1986, in pertinent part, states: Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action....

The court currently has before it defendants' motion for summary judgment on all of plaintiff's claims. Because the court finds that there are genuine issues of material fact regarding certain of plaintiff's claims, defendants' motion will be denied in part and granted in part.

## THE FACTS

### I. Facts Related to Plaintiff's §§ 1985 and 1986, First Amendment, and State Law Claims

From 1988 to 1997, McCormick was under contract with the DPI as an Education Associate. She also served as an officer in a corporation that held the in-fees of ninety-nine year leases at a mobile home park located in Sussex County, Delaware. In August 1996, defendant Jefferson, an Environmental Protection Officer with DNREC, while investigating a complaint regarding an open septic system at the mobile home park, left his business card at the park's office. When plaintiff responded via telephone, Jefferson told her that he would rather speak to a man. When McCormick made it clear that he would have to speak with her regarding the matter, Jefferson told her about the complaint and indicated that the septic system would have to be repaired. Plaintiff assured him that the problem would be fixed. Jefferson informed McCormick that he would need to meet with her at the park to discuss the matter. Plaintiff suggested a meeting time for the following weekend. This was too late for Jefferson so plaintiff agreed to meet with him at her workplace during a break, on Monday, August 26, 1996. At the appointed time, Jefferson appeared at plaintiff's job and served citations on her for violations in connection with the mobile home park's septic system.

On September 9, 1996, Jefferson's supervisor, defendant McDaniel, contacted plaintiff at work via the State's e-mail system. He asked her to respond by e-mail to set up a time to discuss the situation at the mobile home park. The next day plaintiff e-mailed McDaniel that she preferred to speak with McDaniel's supervisor, defendant Hill, or Hill's supervisor. That same day, McDaniel sent another e-mail to plaintiff questioning her further regarding the situation at the mobile home park.

Rather than responding further, later that day, while still at work, plaintiff sent an e-mail message to several DNREC employees, including the Cabinet Secretary of DNREC, Director of Water Resources, Director of Air and Waste Management (the immediate supervisor of McDaniel's supervisor, defendant Hill), and McDaniel. In this message, plaintiff requested cooperation from the agency regarding the septic system issues at the mobile home park. McCormick stated that in her opinion the state had created these issues by approving ninety-nine year leases without a plan for management at the state level, thus causing conflicting decisions between the state agencies. Plaintiff contended that this issue was currently being addressed in Superior Court. McCormick also complained about Jefferson's stated desire to deal with a man which she viewed as discriminatory.

Still later that day, McDaniel contacted her again, this time by telephone, to discuss the problems with the septic system at the mobile home park. The following day, the 11th at 8:28 a.m., McDaniel sent an e-mail message to the Director of Water Resources and sent a copy to McDaniel's supervisor, defendant Hill. Referring to plaintiff's electronic mail message from the previous day to the Secretary and others, McDaniel stated, "Mrs. McCormick needs to be reeled in!" In addition, McDaniel requested a meeting with the Director of Water Resources on this matter. The Director responded later that evening saying, "[w]henever you're ready." Eleven minutes after sending this message, McDaniel sent another to Hill, with a copy to Jefferson, allegedly disparaging McCormick and asserting her use of state time to handle personal business.

On the morning of the 11th, Hill spoke with McCormick's supervisor at the DPI by phone and told her that McCormick had sent several e-mail messages to DNREC personnel over a period of a few days. McCormick notes that, at the time of Hill's discussion with her supervisor, she actually had sent a total of three e-mail messages—two of which were responses solicited by McDaniel on a single day.

Later on the morning of September 11th, McCormick's supervisor, Valerie Woodruff, and Hill met in his office. Reportedly, Hill told plaintiff's supervisor that plaintiff had sent e-mail messages and met with DNREC staff during the work day. Hill also stated that he had seen plaintiff in a state vehicle at the Justice of the Peace Court in Georgetown—an accusation which plaintiff denies.

Later that day, plaintiff's supervisor met with McDaniel. During the meeting, McDaniel said that he had seen plaintiff on August 23 at the Justice of the Peace Court in Georgetown between 10:15 a.m. and 10:30 a.m. Further, McDaniel told Woodruff that when he left the Court at 11:00 a.m. or 11:15 a.m., plaintiff was still there. Reportedly, this assertion was later recanted by McDaniel, while testifying at plaintiff's contract renewal hearing. At this hearing regarding the allegations against plaintiff, McDaniel testified that he had seen plaintiff around lunch time, and, when he had left the Justice of the Peace Court, he had not noticed whether or not she was still there.

On Friday, September 13th, plaintiff gave McDaniel her personal e-mail address and asked him to send any further e-mail messages to that address at her home. Nevertheless, several hours later, McDaniel sent another e-mail message to plaintiff at work. Plaintiff responded and asked whether McDaniel had received her home e-mail address.

Further on September 11th, defendant Jefferson spoke with plaintiff's supervisor by telephone and said that plaintiff had asked for a meeting with him. Apparently, it was Jefferson who requested the original meeting. At his deposition, he admitted that he may have told McCormick that he wanted to meet with her the next week at the park. Jefferson also told plaintiff's supervisor that when plaintiff met with him at the DPI offices, she brought a box of documents to the meeting. Plaintiff, however, testified that she did not bring a box of papers. Finally, Jefferson allegedly told plaintiff's supervisor that he had spent a total of an hour at the DPI offices meeting with plaintiff. Plaintiff testified that her entire meeting time with Jefferson was comparable to a coffee break—approximately 20 minutes.

Prior to the loss of her DPI contract, plaintiff's qualifications for her position as well as her job performance were not an issue. Yet, as a result of the information provided by defendants to her supervisor, plaintiff was informed by letter from the State Board of Education, dated February 28, 1997, that her contract with the DPI would not be renewed. In the section of the letter that sets forth the "circumstances that support the recommendation," the letter states that "[t]he incidents described were brought to the Department's attention during the fall by representatives of another state agency [, and that] [t]hereafter, an investigation was performed." The letter stated that "the proposal to not renew is based on, but not limited to [plaintiff's] misconduct in office, incompetency or willful neglect of duty, performing personal business on state time, improper use of a state electronic system, and falsification of state documents."

Upon the issuance of this letter of nonrenewal, plaintiff was offered and accepted "the opportunity to respond to [the] charges before a hearing officer appointed by the Board." The Board adopted the hearing officer's recommendation of termination. Plaintiff appealed this decision to the Superior Court of the State of Dela-

ware in *McCormick v. Board of Education for the State of Delaware*, C.A. No. 97A–10–003, 1998 WL 960732 (Del.Super. July 22, 1998). In deciding the issue of "whether the evidence [was] legally adequate to support the Board's factual findings," the court held that "[s]ubstantial evidence exists to support a finding that the Department had 'just cause' to terminate McCormick because she violated the rules set out by it." *Id.* at *12. Moreover, the court held that this "evidence fully justifies the hearing officer's refusal to find that McCormick was subject to disparate treatment." *Id.* at *13. Though it found that there was just cause to decide not to renew McCormick's employment contract, the court held that because the Board failed to comply with the statutory time limits for giving notice, the attempt to terminate the contract failed. Consequently, the contract termination date was extended by statute for one year. *Id.*

## II. Facts Related to Plaintiff's § 1983 and State Law Claims

On Friday, September 20, 1996, plaintiff's father, William Lloyd, was arrested by defendant Jefferson.[6] McCormick, anticipating the processing of her father at the police station in Bridgeville, Delaware, which also housed a DNREC field office, proceeded there to await the arrival of Jefferson and her father. Plaintiff pulled a video camera from her car that she used in her work, hoping this might deter Jefferson from being as rough with her father as she claims he was at the time of the initial arrest.

When Jefferson arrived with Lloyd, McCormick walked toward the back of the station and started to cross over to ask if she would be allowed to go into the building with her father. According to McCormick, Jefferson approached her, crossing

over the back of the parking lot to where she was standing. At that time, he put his left hand over the lens of the video camera, grabbed plaintiff's arm with his right hand, and told her, "Get out of here." Plaintiff responded that she wished to enter the building with her father, and Jefferson replied, "You can't." Three times Plaintiff contends that she said, "Don't touch me. Don't touch me. Take your hands off me. You are hurting me." Nonetheless, plaintiff says that Jefferson continued to hold her arm in a tight, wrenching grip for a long period of time and that every time plaintiff said, "Don't touch me," he changed and tightened his grip. In addition, plaintiff alleges that Jefferson pushed her around the corner of the building and detained her without cause. She says that when she screamed, Jefferson finally let go and backed away. Plaintiff then walked around to the front of the station, entered through the front door, charged her video camera, and went back to wait at her car.

As a result of Jefferson's actions, McCormick complains that she suffered contusions to her arm. She was treated at the emergency department of Kent General Hospital early the next morning. Notes made by the attending physician reflect that the bruised areas on McCormick's left arm had the appearance of a hand print with a thumb print to the front and palm and finger prints to the rear and were consistent with McCormick having been grabbed with the right hand.

Jefferson contends that he told McCormick a number of times to go to the public entrance in the front of the building. Further, he asserts that she continued to advance toward the police entrance where Jefferson was attempting to proceed with

---

**6.** This arrest stemmed from an incident which occurred on August 19, 1996, between a recently hired DNREC employee and William Lloyd. The employee was at the mobile home park as part of a public well mapping project. During the employee's visit, Lloyd is alleged to have engaged in an unlawful touching and

menacing by placing one hand on the employee's shoulder and the other on a pistol at his side. Once Lloyd realized the individual was not a threat, he went on to other business. It is the arrest on those charges that led to the parking lot confrontation between plaintiff and Jefferson.

the prisoner, Lloyd. Defendant claims that after McCormick was told numerous times to go to the public entrance, plaintiff continued toward the police entrance, intent on going in with her father. According to Jefferson, he finally had to place himself between plaintiff and the police entrance and approached the plaintiff. Jefferson asserts that he then placed his left hand on the video camera and his right hand on McCormick's upper left arm, and after a few seconds, plaintiff complied by turning and proceeding towards the front entrance. During oral argument, there was a dispute as to whether or not the parking lot in question was restricted to police personnel.

### STANDARD OF REVIEW

"Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party establishes that there is no genuine issue of material fact that can be resolved at trial and that the moving party is entitled to judgment as a matter of law." *House v. New Castle County,* 824 F.Supp. 477, 481 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In evaluating whether or not there are any genuine issues of material fact, "[m]ateriality is determined by the substantive law that governs the case." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "In this inquiry, '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Id.* "A dispute is 'genuine' only if a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party has the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact." *Robinson*

*v. Clemons,* 987 F.Supp. 280, 283 (D.Del. 1998) (quoting *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548) (internal quotation marks omitted). After the moving party satisfies this responsibility, "the nonmoving party must go beyond the pleadings and, based on the same types of evidence, must demonstrate 'specific facts showing that there is a genuine issue for trial.'" *Id.* "When considering a motion for summary judgment, the Court must 'view all facts and inferences in the light most favorable to the party opposing the motion.'" *Id.* (citing *Stephens v. Kerrigan,* 122 F.3d 171, 176–77 (3d Cir. 1997)). Moreover, "[i]f the evidentiary record supports a reasonable inference that the ultimate facts may be drawn in favor of the responding party, then the moving party cannot obtain summary judgment." *House,* 824 F.Supp. at 481–82 (citing *In re Japanese Elec. Prod. Antitrust Litig.,* 723 F.2d 238, 258 (3d Cir. 1983), *rev'd on other grounds,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Put another way, "[a]ny doubts as to the existence of genuine issues of fact will be resolved against the moving party and all inferences to be drawn from the material it submits will be viewed in the light most favorable to the party opposing the motion." *Id.*

Finally, at this stage of the process, "'the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Lewis v. State of Delaware Dept. of Pub. Instruct.,* 948 F.Supp. 352, 357 (D.Del.1996) (quoting *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505).

### DISCUSSION

### I. William Lloyd's Claims

Pursuant to Fed.R.Civ.P. 41(a)(1), the parties have stipulated to a partial dismissal with prejudice of all claims of plaintiff William Lloyd.

## II. Claims Brought Pursuant Section 1983

■ In order to state a claim under § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Barna v. City of Perth Amboy,* 42 F.3d 809, 815 (3d Cir.1994) (quoting *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* at 815–16 (quoting *West,* 487 U.S. at 49, 108 S.Ct. 2250) (internal quotation marks omitted). "It is firmly established that a defendant in a section 1983 suit acts under color of state law when he abuses the position given to him by the State." *Id.* (citing *West,* 487 U.S. at 49, 108 S.Ct. 2250; *Screws v. United States,* 325 U.S. 91, 111, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945)).

In this case, there is no dispute that defendants' actions, relating to plaintiff's § 1983 claims, were performed under color of state law. Consequently, the court will analyze plaintiff's claims according to the first element in establishing a claim under § 1983, i.e., whether plaintiff states a claim of a "violation of a right secured by the Constitution and laws of the United States." [7]

### A. Fourth Amendment: Unreasonable Seizure and Excessive Force Claim

Plaintiff makes five separate claims cognizable under 42 U.S.C. § 1983. The first

of these claims is grounded in her right to be free of unreasonable seizure, as guaranteed by the Fourth Amendment of the United States Constitution. In addressing plaintiff's claim, the court must first decide whether she was seized, and, if so, did Jefferson use excessive force in the process.

■ "A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority, ... in some way restrained the liberty of a citizen[.]'" *Graham v. Connor,* 490 U.S. 386, 395 n. 10, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (quoting *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). "The Fourth Amendment's requirement that searches and seizures be founded upon an objective justification, governs all seizures of the person, 'including seizures that involve only a brief detention short of traditional arrest.'" *U.S. v. Mendenhall,* 446 U.S. 544, 551, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (citations omitted). "[The Supreme Court] conclude[d] that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 554, 100 S.Ct. 1870. "'Whenever an officer restrains the freedom of a person to walk away he has seized that person.'" *House,* 824 F.Supp. at 490 (quoting *Tennessee v. Garner,* 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)).

In *Gallo v. City of Philadelphia,* 161 F.3d 217 (3d Cir.1998), a case involving a

---

7. Certain of McCormick's § 1983 claims include allegations of violations of both procedural and substantive liberty guarantees of due process under the Fourteenth Amendment based on excessive force and wrongful detention. "The Supreme Court has instructed that 'all claims that law enforcement officers have used excessive force ... in the course of a[ ] ... "seizure" of a free citizen should be analyzed under the Fourth Amend-

ment and its "reasonableness" standard, rather than under a "substantive due process" approach.'" *Mellott v. Heemer,* 161 F.3d 117, 121 (3d Cir.1998) (quoting *Graham,* 490 U.S. at 395, 109 S.Ct. 1865). Consequently, McCormick's excessive force claims that entail allegations of the use of physical force to restrain her liberty will be analyzed under the Fourth Amendment. *Id.*

Fourth Amendment seizure in the context of a § 1983 claim of malicious prosecution, the Court of Appeals for the Third Circuit reiterated the need to adopt "a broad approach in considering what constitutes a seizure." *Id.* at 224. "Additionally, the Supreme Court has clarified that seizures can be of different intensities." *Id.* at 223. Moreover, the Third Circuit stated that "Supreme Court cases have not equated a seizure with a significant deprivation of liberty. . . . Indeed, Supreme Court cases concerning seizure generally involve restricting an individual's movement to a small area." *Id.* at 224.

■ In the instant case, plaintiff alleges that Jefferson approached her, put his left hand over the lens of her video camera, and grabbed and continued to hold her arm in a tight wrenching grip for a long period of time. According to plaintiff, defendant's grip tightened each time she requested that he release her. In addition, plaintiff alleges that Jefferson pushed her around the corner of the building and detained her. As noted above, defendant denies these allegations. He contends that he merely put one hand up to the video camera lens and the other on plaintiff's left arm and that she acquiesced as he directed her toward the front entrance of the station.

There is clearly a factual dispute as to what transpired between plaintiff and defendant in the parking lot. The court's job at this stage in the proceeding is not to attempt to credit one side or the other in an attempt to resolve that dispute. 948 F.Supp. at 357. Indeed, at summary judgment, it is the non-moving party (here the plaintiff) that is entitled to the resolution of facts and reasonable inferences in her favor. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Whether plaintiff was seized is a question of material fact because a seizure is a prerequisite to a finding of Fourth Amendment based liability. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Mellott,* 161 F.3d at 124. The dispute is genuine because there is sufficient evidence upon which a reasonable trier of fact could find for plaintiff. *House,* 824 F.Supp. at 491; *cf. Mellott,* 161 F.3d at 124–25 (in contrast, ruling in favor of defendants, as a matter of law). Specifically, should the jury credit plaintiff's version of the events, the court holds that those facts would be sufficient for the jury to conclude that plaintiff was seized. *Id.* In other words, the resolution of this dispute will determine whether or not plaintiff was seized. This is a job that belongs to a jury. *Id.*

■ Turning the analysis from the issue of whether plaintiff was seized to whether Jefferson utilized excessive force in the course of that seizure, "[i]n order to prevail on a Fourth Amendment excessive force claim, a plaintiff must demonstrate that the defendant's use of force was not 'objectively reasonable.' " *Mellott,* 161 F.3d at 122 (citing *Graham,* 490 U.S. at 397, 109 S.Ct. 1865). A determination of whether the force applied in this instance was objectively reasonable requires the examination of a variety of factors "including severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Id.* Also, "it is important to consider how many individuals the officers confronted and whether 'the physical force applied was of such an extent as to lead to injury.' " *Id.* (quoting *Sharrar v. Felsing,* 128 F.3d 810, 822 (3d Cir.1997)). "Other relevant factors include the possibility that the persons subject to the police action [were] themselves violent or dangerous, the duration of the action, whether the action [took] place in the context of effecting an arrest, the possibility that the suspect may [have been] armed, and the number of persons with whom the police officer . . . [had to] contend at one time." *Sharrar,* 128 F.3d at 822.

Looking initially at the severity of the crime, note must first be taken that plaintiff was not at the outset the focus of the defendant's arrest efforts. It was plain-

tiff's father, William Lloyd, who defendant was taking into the station for processing for a non-violent offense. Plaintiff was, at first, only a bystander who sought to record the events attendant to her father's arrest—or, at least, sought to appear to be recording these events. When she became engaged with defendant, it was not as the result of any threat plaintiff or Lloyd posed to the officer's safety but rather his efforts apparently designed to prevent plaintiff's use of her video camera and/or her entry into the station through the back door. The arrestee, plaintiff's father, appeared to be in defendant's control and making no attempt to resist or flee.

Moreover, there is no evidence that Lloyd or plaintiff were violent or dangerous or that either individual might have been armed with anything more than a camera. And, while they outnumbered defendant two to one and while one's own arrest and the witnessing of such an event by a loved one might be emotionally charged, the record reflects no behavior by either Lloyd or plaintiff that might have been reasonably interpreted by the defendant as threatening to his or his prisoner's safety. Finally, plaintiff contends that she suffered physical injury, a severely bruised right arm, as a direct result of the application of a "wrenching" grip by defendant. Defendant contests this allegation but, as previously noted, at the summary judgment stage the court must accept the nonmoving party's contention as true.

The court is mindful of the teaching of the Supreme Court in *Graham* that not every injury sustained by a citizen during an encounter with law enforcement officials gives rise to a constitutional claim. *House*, 824 F.Supp. at 491 (citing *Troublefield*, 789 F.Supp. at 166; *Graham*, 490 U.S. at 396, 109 S.Ct. 1865). It is also clear that courts should "keep in mind that a threat that may seem insignificant to us in the security of our chambers may appear more substantial to a reasonable officer whose own life or safety is at stake." *Mellott*, 161 F.3d at 122. Nevertheless, in sum, the absence of any threatening behavior, the control defendant exercised over the situation confronting him, and the fact that plaintiff sustained physical injury directly at his hands, make it inappropriate at this time to find that the use of force under the circumstances was objectively reasonable.

In addition, the court cannot find under these facts that the officer found himself in a situation requiring "split-second judgments." Although, some tension was undoubtedly presented by the situation and already existed between plaintiff and Jefferson—plaintiff sought to photograph defendant's actions during the arrest of her father and the earlier contacts between the two—the court does not find that the circumstances confronting the officer in the parking lot were so "uncertain" or "rapidly evolving" that the "calculus of reasonableness" as to the amount of force that was required would weigh in defendant's favor. *Id.* Indeed, plaintiff was known to defendant. At least, he knew her to be a fellow state employee. This should have removed a good bit of the uncertainty from the calculus.

Given this state of the record, the court is not prepared to say that defendant Jefferson's conduct was objectively reasonable. Therefore, the court will not find in favor of defendant Jefferson as a matter of law regarding plaintiff's Fourth Amendment excessive force claim. Defendant Jefferson has not convinced the court that there are sufficient undisputed facts in the record upon which the court could base such a finding. As such, the entry of summary judgment for defendant Jefferson regarding plaintiff's excessive force claim must be denied.

## B. Fourteenth Amendment: Substantive "Liberty" Guarantees of Due Process Claim

Next, McCormick's § 1983 claim is grounded in her right to be "free from State-occasioned violence and injury to her bodily integrity, as provided by the

substantive 'liberty' guarantees of due process." "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force.... The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." [8] *Graham,* 490 U.S. at 394, 109 S.Ct. 1865.

Moreover, the Supreme Court stated that *Graham*

> does not hold that all constitutional claims relating to physically abusive government conduct must arise under either the Fourth or Eighth Amendments; rather, *Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.

*County of Sacramento v. Lewis,* 523 U.S. 833, ——, 118 S.Ct. 1708, 1715, 140 L.Ed.2d 1043 (1998) (quoting *United States v. Lanier,* 520 U.S. 259, 272 n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)). Consequently, a substantive due process analysis would be inappropriate only if the claim was 'covered by' the Fourth Amendment. *Id.*

Since McCormick has alleged a violation of her substantive due process rights under the Fourteenth Amendment on the grounds of alleged state-occasioned violence to her person without alleging a seizure, this claim is not "covered by" the Fourth Amendment, and, thus, this claim will be analyzed according to the substantive due process approach and its "shocks the conscience" standard in which "only the most egregious [executive] official conduct can be said to be 'arbitrary in the constitutional sense.'" *Id.* at 1716 (1998) (quoting *Collins v. Harker Heights,* 503 U.S. 115, 129 and 126, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at 1718. The Supreme Court's "concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience-shocking." *Id.* at 1718–19.

In *Lewis,* the Supreme Court held that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by an action under § 1983." *Id.* at 1720. There, the Supreme Court applied a "middle range" level of culpability to the police action in that case. *Id.* at 1718. The range of culpability standards cognizable under the rubric of substantive due process starts on the low end somewhere above negligence, which is "categorically beneath the threshold of constitutional due process;" extends through mid-range culpability which includes in some circumstances recklessness, gross negligence, and

---

**8.** In *Graham,* the Supreme Court went on to hold that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." 490 U.S. at 395, 109 S.Ct. 1865. The Supreme Court explained its holding as follows: "[b]ecause we have 'always been reluctant to expand the concept of substantive due process,' we held in *Graham v. Connor* that

'[w]here a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" *County of Sacramento v. Lewis,* 523 U.S. 833, ——, 118 S.Ct. 1708, 1714, 140 L.Ed.2d 1043 (1998) (citing *Albright v. Oliver,* 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality opinion of Rehnquist, C.J.) (quoting *Graham,* 490 U.S. at 395, 109 S.Ct. 1865)).

deliberate indifference; and culminates at the high end with malicious, sadistic intent. *Id.* at 1718–20. According to *Lewis,* the applicable standard to be met before the defendant's conduct can be said to shock the conscience is heightened as the situation intensifies or is deemed an emergency, requires judgment on the spot with little opportunity to contemplate ones actions, and entails countervailing governmental interests. *Id.*

In the instant case, plaintiff asserts that Jefferson's attack on her outside of the Bridgeville Police Station was unprovoked, unjustified, and unreasonable. Nevertheless, plaintiff has not produced sufficient evidence to state a substantive due process violation according to the shocks the conscience standard. Plaintiff admits to the chaotic, rapidly evolving nature of the situation. Moreover, she admits that Jefferson's actions took place during the lawful arrest of her father. Consequently, defendant's actions cannot be said to fit within the category of "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Id.* at 1716.

■ The Courts recognizes that "[s]ubstantive due process is based on 'the right to be free of state intrusions into realms of personal privacy and bodily security through means so brutal, demeaning, and harmful as literally to shock the conscience of a court.'" *Metcalf v. Long,* 615 F.Supp. 1108, 1119 n. 12 (D.Del.1985) (quoting *Hall v. Tawney,* 621 F.2d 607, 613 (4th Cir. 1980)). Moreover, within the rubric of substantive due process, "[o]ne right which has been deemed 'fundamental' is the right of individuals to be free from treatment by law enforcement officers that 'shocks the conscience.'" *Id.* at 1120 (citing *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952)).

Nevertheless, "the constitutional protection under substantive due process is not coextensive with the common law action for assault and battery." *Id.* at 1121. As the court in *Metcalf v. Long* recognized,

"this district has found repeatedly in cases involving allegations of excessive force by police officers, a mere assault and battery does not rise to the level of a constitutional violation." *Id.* (citations omitted). Beyond an intentional tort, the plaintiff "must prove acts which amount to shocking or brutal conduct." *Id.* (citing *Davidson v. Dixon,* 386 F.Supp. 482, 488 (D.Del.1974), aff'd mem., 529 F.2d 511 (3d Cir.1975)).

*Metcalf* involved a detainee who experienced police violence after he had been placed under arrest, and thus the court analyzed his excessive force claim under the Fourteenth Amendment. There the court reasoned that "even assuming that there was no cause for this attack ... [e]ven [plaintiff's] version of the incident indicates that it was a brief skirmish giving rise to minor injuries." *Id.* Metcalf had suffered "a whiplash type neck injury and a pinched nerve in his right wrist." *Id.*

■ Similarly, McCormick has established evidence that evinces an alleged assault and battery by Jefferson. This court, like others confronted with this issue, is "reluctant to expand the concept of substantive due process." *Lewis,* 118 S.Ct. at 1714 (quoting *Collins,* 503 U.S. at 125, 112 S.Ct. 1061)). Moreover, "the Fourteenth Amendment is not a 'font of tort law to be superimposed upon whatever systems may already be administered by the States.'" *Id.* at 1718 (quoting *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)). Therefore, the court finds that Jefferson's actions in these circumstances did not violate McCormick's Fourteenth Amendment substantive due process rights. Consequently, defendants motion for summary judgement regarding this claim is granted.

**C. Fourteenth Amendment: "Liberty and Property Guarantees of Due Process" Claim**

Next, among McCormick's § 1983 claims, plaintiff contends that defendants interfered with her contractual relationship with her employer by providing false

and damaging information to her supervisor, thereby violating plaintiff's right "to be free from injury to her reputation and from interference with her contractual relationships, as guaranteed by the liberty and property guarantees of due process."[9] Plaintiff asserts that on September 11, 1996, Hill, McDaniel, and Jefferson all spoke with plaintiff's supervisor at the DPI. Plaintiff contends that "an obvious impetus for [d]efendants' actions was [p]laintiff's complaint on September 10, 1996 to upper-level officials at DNREC about her treatment by Jefferson." She lists specific instances where defendants allegedly provided false information, including instances where plaintiff alleges that the defendants changed their story when under oath. Plaintiff asserts that "[d]efendants as State officials, used their influence with another State official who directly supervised [plaintiff] to secure the termination of [her] employment based upon defamatory statements." In response, defendants argue that plaintiff has failed to demonstrate or indicate that the statements they made to plaintiff's former supervisor were in any way "material or defamatory."

**1.) Fourteenth Amendment Liberty Interest in Reputation Claim**

In *Morris v. Board of Education of the Laurel School District*, 401 F.Supp. 188, 210 (D.Del.1975), the district court found that the plaintiff's Fourteenth Amendment liberty interest was implicated by her discharge from her position as a nontenured Delaware school teacher "for persistent insubordination." The court explained that "[w]hile a teacher's interest in a particular teaching job does not constitute a liberty interest, a teacher does have an interest in her ability to pursue her teaching career which is protected by the Due Process Clause." *Id.* Moreover, "a state cannot foreclose a range of employment opportunities in a manner that contravenes due process." *Id.* (citing *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). After receiving testimony at trial from Board members and a professional in the field of teacher placement in Delaware and vicinity, confirming the potential damaging effect on future placement of non-renewal for this reason, the *Morris* court concluded that the plaintiff "had a liberty interest of which she could not be deprived without being accorded procedural and substantive due process." *Id.* at 211.

"The Supreme Court, in the seminal case of *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), recognized that an individual has a protectable interest in reputation." *Ersek*

9. Regarding plaintiff's Fourteenth Amendment due process claim of deprivation of her property interest in her employment, it is not obvious to the court whether plaintiff is seeking relief based on procedural or substantive due process. Plaintiff's claim centers around defendants' alleged actions regarding the termination of her employment contract. Plaintiff alleges that the defendants initiated and influenced the contract renewal process, but she does not explicitly challenge the adequacy or the constitutional sufficiency of the contract hearing process itself.

The [Supreme] Court has identified the following as elements of due process: (1) notice of the basis of the governmental action; (2) a neutral arbiter; (3) an opportunity to make an oral presentation; (4) a means of presenting evidence; (5) an opportunity to cross-examine witnesses or to respond to written evidence; (6) the right to be represented by counsel; and (7) a decision based on the record with a statement of reasons for the result.
*Rogin v. Bensalem Twp.*, 616 F.2d 680, 694 (3d Cir.1980).

"It is the law in this Circuit that a state provides adequate [procedural] due process when it provides 'reasonable remedies to rectify a legal error by a local administrative body.'" *Bello v. Walker*, 840 F.2d 1124, 1128 (3d Cir.1988) (citations and internal quotation marks omitted). 14 *Del.C.* § 121(4), *see infra* note 10, provides such a process as required by both the Supreme Court and the Court of Appeals for the Third Circuit. Specifically, McCormick's contract renewal process entailed all the factors listed above from a procedural standpoint. Consequently, plaintiffs claim will be analyzed further as a *substantive* due process claim.

*v. Township of Springfield,* 102 F.3d 79, 83 (3d Cir.1996). "It stated that 'where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.'" *Id.* (quoting *Wisconsin,* 400 U.S. at 437, 91 S.Ct. 507). In the case of *Paul v. Davis,* the Supreme Court held that the last sentence "referred to the fact that the governmental action taken in that case deprived the individual of a right previously held under state law...." 424 U.S. at 708, 96 S.Ct. 1155. Moreover, the Court held that "[i]t is clear that to make out a claim for a violation of a liberty interest in reputation a plaintiff must show a stigma to his reputation plus some concomitant infringement of a protected right or interest." *Ersek,* 102 F.3d at 83 n. 5 (citing *Paul,* 424 U.S. at 701, 709, 96 S.Ct. 1155).

"For government action to infringe the 'reputation, honor, or integrity' of an individual, that government action first must involve publication that is substantially and materially false." *Id.* at 83–84 (citations omitted). "[T]he disputed or false statements must harm the plaintiff." *Id.* at 84. "The principal relief to which an individual is entitled should the government's stigmatizing comments rise to the level of a due process violation is a hearing to clear his name." *Id.*

■ In the instant case, plaintiff's claim of a violation of her liberty interest in her reputation is accompanied by a concomitant infringement of an independent right protected by the due process clause, i.e., the extinguishment of her property right in her employment, a right provided by state law. *Ersek,* 102 F.3d at 83 n. 5. Notwithstanding these considerations, the court finds that McCormick has already received the process due to her. As a result of the contract renewal hearing and the appeal to the Superior Court, plaintiff has had the opportunity to tell her side of the story and refute the charges against her in an effort to clear her name. *Roth,* 408 U.S. at 573 n. 12, 92 S.Ct. 2701. Addi-

tionally, plaintiff has received damages by way of the Superior Court judgment for violations of her procedural due process rights during the contract hearing process. Therefore, defendants' motion for summary judgment regarding plaintiff's liberty interest Fourteenth Amendment due process claim is granted.

**2) Fourteenth Amendment Property Interest Claim**

In the case of *Kelly v. Borough of Sayreville, New Jersey,* 107 F.3d 1073, 1076 (3d Cir.1997), the plaintiff alleged in his complaint "damage to his liberty interest in his reputation and his property interest in his employment" in violation of the Fourteenth Amendment. The Court of Appeals for the Third Circuit explained that "[t]o establish a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate a violation of a right secured by the Constitution and the laws of the United States and that the alleged deprivation was committed by a person acting under color of state law." *Id.* at 1077 (quoting *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1141 (3d Cir.1995) (internal quotation marks omitted)). In the instant case, it is undisputed that defendants acted under color of state law, thus the issue is whether defendants actions deprived plaintiff of a property interest guaranteed by the Constitution.

Additionally, McCormick must establish that she had a constitutionally protected interest in her continued employment at the DPI in order to make out a due process claim in connection with the termination of her employment. *Walls v. City of Milford,* 938 F.Supp. 1218, 1221 (D.Del. 1996). "Constitutionally protected property interests are created and defined by an independent source, such as state law." *Id.* (citing *Roth,* 408 U.S. at 567, 92 S.Ct. 2701; *Brown v. Trench,* 787 F.2d 167, 170 (3d Cir.1986)). "Public employees who can only be terminated for cause have been deemed to possess constitutionally protected property interests in their continued employment." *Id.* (citing *Richardson v.*

*Felix,* 856 F.2d 505, 509 (3d Cir.1988); *Brown,* 787 F.2d at 171; *Dixon v. Mayor and Council of Wilmington,* 514 F.Supp. 250, 253 (D.Del.1981)). "A public employee with a constitutionally protected interest in his continued employment cannot be denied this interest without substantive and procedural due process." *Id.* at 1222 (citing *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)).

In the instant case, Delaware law provided plaintiff's property interest in her employment at the DPI via 14 *Del.C.* § 121(4).[10] Notwithstanding a public employee possessing a constitutionally protected property rights in her employment, the Court of Appeals for the Third Circuit explained that in order to state a claim for deprivation of a property interest in violation of the Fourteenth Amendment, the plaintiff must prove that the defendant interfered with plaintiff's employment rights by way of an "adverse employment action." *Kelly,* 107 F.3d at 1077 (citations omitted). The court stated "that the cru-

cial question is whether the plaintiff 'has alleged the alteration or extinguishment of some additional interest.'" *Id.* at 1078 (quoting *Sturm v. Clark,* 835 F.2d 1009, 1013 (1987)).

From the above discussion of applicable law, one can easily discern that plaintiff possessed a property interest in her employment via state law, specifically 14 *Del.C.* § 121(4). Plaintiff asserts that defendants intended to interfere with her property right in her employment by contacting her supervisor and providing disparaging information about the plaintiff to her supervisor. Plaintiff's property interest in her position at the DPI was extinguished through non-renewal of her contract, causing her lost compensation.

Nevertheless, in *Bradley v. Pittsburgh Board of Education,* 913 F.2d 1064, 1077 (3d Cir.1990), the plaintiff, a terminated public high school teacher, based his substantive due process claim attacking his termination on the grounds that the charges against him were pretexual and

---

10. 14 *Del.C.* § 121(4), General Powers of the Department of Education, as amended, provides:

The Department shall exercise general control and supervision over the public schools of the State, including:
(4) Hiring, through the Secretary, by execution of a written contract for a term of not less than 1 year and not more than 5 years, of certificated professional employees, other than those persons described in subsection (3) of this section and S 103(a)(2) of this title, necessary for carrying out the policies, rules and regulations of the Department. For the purposes of this subsection, the term "certificated professional employees" includes education associates, education specialists, field agents, technicians and other employees holding positions of similar rank. The Secretary may elect not to renew the contract of a certificated professional employee upon its expiration. However, in such a case, the Secretary shall notify the employee in writing by certified mail, return receipt requested, at least 4 months prior to the expiration date of the existing contract that he or she does not intend to renew the contract, thereby providing official notice that the services of the

employee are to be terminated; provided, however, that any person so notified will automatically be entitled to a 2–month extension of his or her existing contract in order that he or she may be afforded a total of 6 months' notice. Failure to notify a person covered under this subsection in writing by the required date shall result in an automatic extension of the existing contract for a period of 1 year from its expiration date. The written notification shall indicate that just cause exists for the Secretary's proposed action. For the purposes of this subsection, "just cause" shall be defined as including, but not limited to, reduction in force, inefficiency, or unsatisfactory performance of duties. Any employee notified of the Secretary's intention not to renew for reasons other than a reduction in force may request a formal hearing before a hearing officer appointed by the State Personnel Director to present information in his or her own defense and may have legal counsel at the hearing. Such hearing shall be held not earlier than 10 days nor more than 90 days after the issuance of the written notification of the Secretary's intent not to renew the contract, unless both parties mutually agree to a different schedule;
Del.Code Ann tit. 14, § 121(4) (1997).

rendered by the defendants in bad faith. In that case, the plaintiff appealed his termination in state court as provided by the applicable statute. The state court ruled that the plaintiff's conduct "constituted negligence and persistent violation of school laws." *Id.* at 1073. In considering the plaintiff's substantive due process claim challenging his termination, the Third Circuit gave preclusive effect to the state court finding that the plaintiff was properly terminated. Given this legitimate basis for the plaintiff's termination, the Third Circuit reasoned that it could not say that "the firing was so arbitrary and capricious as to violate substantive due process." *Id.*

■ Likewise, in the instant case, the court finds as a matter of law that McCormick's termination by the DPI was rationally related to a legitimate government interest, because preclusive effect must be given to the Superior Court finding that the Board adduced sufficient evidence of just cause not to renew plaintiff's contract. Therefore, defendants' motion for summary judgment regarding plaintiff's Fourteenth Amendment substantive due process claim is granted.

### D. First Amendment Retaliation Claim:

McCormick contends that "[d]efendants' actions in defaming [her] and damaging her reputation were undertaken in conjunction with a violation of plaintiff's First Amendment rights." She contends that these actions were taken in retaliation for plaintiff's exercise of her rights in complaining about defendant Jefferson's actions to DNREC officials. Defendants counter that plaintiff has failed to establish the elements of a defamation. They argue that the content of plaintiff's electronic

mail messages is not protected expression.[11]

### 1. General Principles

■ "In order to prevail on a retaliation claim, the plaintiff has to prove: 'first, that [she] engaged in a protected activity; second, that the Government ... responded with retaliation; and third that [her] protected activity was the cause of the Government's retaliation." *Rappa v. Hollins,* 991 F.Supp. 367, 374 (D.Del.1997) (citing *Anderson v. Davila,* 125 F.3d 148, 160 (3d Cir.1997)). "The burden is on the plaintiff to show that [her] conduct was constitutionally protected." *Id.* at 374 n. 14. (citing *Mt. Healthy City Sch. Dist. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). "In addition, in order to establish causality, the plaintiff must demonstrate the conduct was a 'substantial' or 'motivating' factor in the alleged retaliatory act." *Id.*

The first inquiry, whether plaintiff's speech is protected by the First Amendment, is a question of law. *Azzaro v. County of Allegheny,* 110 F.3d 968, 975 (3d Cir.1997) (citing *Watters v. City of Philadelphia,* 55 F.3d 886, 892 (3d Cir.1995)). Two conditions must be satisfied for a public employee's expressive conduct to be deemed constitutionally protected:

> First, the employee's conduct must address a 'matter of public concern,' which is to be determined by the 'content, form, and context of a given statement, as revealed by the whole record.' Second, the value of that expression must outweigh 'the government's interest in the effective and efficient fulfillment of its responsibilities to the public.'

**11.** In addition, defendants argue that "[p]laintiff can not seriously contend that she has a privilege to misuse State property, services and time." As for this argument, defendant is correct that plaintiff was adjudged to have misused state property, and this Court must abide by that ruling under the doctrine of issue preclusion, discussed later. Neverthe-

less, this finding against McCormick does not foreclose the possibility of an "alternative lawful act upon which she may state a claim for relief [, i.e.,] she engaged in protected free speech activity." *Holder v. City of Allentown,* 987 F.2d 188, 199 (3d Cir.1993); *Bradley,* 913 F.2d at 1074–75. Therefore, the court will address plaintiff's First Amendment claim.

*Id.* at 976 (quoting *Connick v. Myers*, 461 U.S. 138, 147–48, 150, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). Moreover, "[a] discharged public employee is entitled to no redress if her expression is not related to a matter of public concern or, even if it is so related, if its value is outweighed by the value of permitting the government to take action promoting efficiency and effectiveness." *Id.*

Here, at summary judgment, the court then must decide if a genuine issue of material fact exists regarding (1) whether McCormick's complaint was "a motivating factor in the decision to discharge" her and (2) whether McCormick "would have been discharged for other reasons even in the absence" of her complaint against defendant Jefferson. *Id.* at 975.

## 2. Matter of Public Concern

■ "An employee's speech addresses a matter of public concern when it can be 'fairly considered as relating to any matter of political, social, or other concern to the community.'" *Watters*, 55 F.3d at 892 (citing *Holder*, 987 F.2d at 195; *Connick*, 461 U.S. at 146, 103 S.Ct. 1684). "Speech by a public employee 'as a citizen upon matters of public concern' is distinguished from speech by 'an employee upon matters of only personal interest' for which, 'absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.'" *Id.* (citing *Connick*, 461 U.S. at 147, 103 S.Ct. 1684).

On the other hand, "[i]t is the value of exchanges of information and ideas relevant to self-governance that entitles public concern speech to 'special protection.'" *Azzaro*, 110 F.3d at 977. "Silencing a public employee seeking to speak on a matter of public concern deprives a self-governing society of information that may be vital to informed decision-making." *Id.* (citing *Pickering v. Board of Educ.*, 391 U.S. 563, 571–72, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Watters*, 55 F.3d at 886). "[T]he issue is whether it is important to the process of self-governance that communications on this topic, in this form and in this context, take place." *Id.*

### a.) Form, Context, and Place

"[The Third Circuit] has found public employee criticism of office internal operations a matter of public concern." *Swineford v. Snyder County*, 15 F.3d 1258, 1271 (3d Cir.1994). In this line of cases, the court makes a distinction between "speech disclosing public officials' misfeasance" which is protected and "speech intended to air personal grievances" which is not protected. *Id.* (citing *Czurlanis v. Albanese*, 721 F.2d 98, 103 (3d Cir.1983)). "*Connick* indicates that the speaker's motive, while often a relevant part of the context of the speech, is not dispositive in determining whether a particular statement relates to a matter of public concern." *Azzaro*, 110 F.3d at 978 (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1201 (3d Cir.1988)). Moreover, "[w]hile, ... an employee's motive may be relevant to whether speech is on a matter of public concern, giving controlling significance to 'primary purpose' is inconsistent with the result in *Connick*." *Id.* at 979.

■ Here the court first must analyze each of McCormick's statements in light of the above precedent to determine whether any of these statements is protected speech. Though it is clear that her statements emanated from her personal interests, i.e., the citation concerning the condition of the septic tank at the mobile home park where she serves as a corporate officer and her perceived mistreatment by defendant Jefferson, these statements also arguably touch on matters of public concern. As indicated above, the controlling case law makes clear that McCormick's personal interests are not dispositive of the issue of the characterization of her statements. *Azzaro*, 110 F.3d at 978 (citing *Rode*, 845 F.2d at 1201). Furthermore, like the plaintiff in *Czurlanis*,

McCormick's speech seems more akin to that of a concerned citizen than a disgruntled employee. 721 F.2d at 103. It is clear from the content of her e-mail message to certain members of DNREC's upper management that her statements expressed concern for the state policy of approving ninety-nine year leases and the ramifications of a lack of a comprehensive policy regarding such properties. In addition, the issue of allegedly discriminatory behavior by a DNREC employee, especially one whose duties involve contact with the public, touch on matters of public concern.

As stated above, it is a question of law whether plaintiff's speech is constitutionally protected. The court finds that plaintiff has satisfied the first condition for constitutional protection, i.e., that the expression address a matter of public concern. The court now turns to the second condition that must be satisfied for the speech to be given constitutional protection.

**b.) Balancing Test (The Value of the Expression)**

▮ "The next step in our analysis is to conduct the balancing of interests required by *Pickering* and *Connick*." *Azzaro*, 110 F.3d at 980. "On one side we weigh the public employee's interest in speaking about a matter of public concern and the value to the community of her being free to speak on such matters." *Id.* (citing *Green v. Philadelphia Housing Auth.*, 105 F.3d 882, 885 (3d Cir.1997); Watters, 55 F.3d at 895; *Versarge v. Township of Clinton New Jersey*, 984 F.2d 1359, 1366 (3d Cir.1993)). "Balanced against these interests is the government's interest as an employer in promoting the efficiency of the services it performs through its employees." *Id.* (citing *Watters*, 55 F.3d at 895). "Only if the value of the speech, as measured by the employee's and the public's interests, is outweighed by the government's interest in effective and efficient provision of services, will [the

court] hold that the speech is unprotected." *Id.*

As stated above, the court must weigh McCormick's "interest in speaking and the public's interest in hearing," against the interests of the State, as the public employer of both parties. *Swineford*, 15 F.3d at 1272 (citing *Versarge v. Clinton*, 984 F.2d 1359, 1366 (3d Cir.1993); *O'Donnell v. Yanchulis*, 875 F.2d 1059, 1061 (3d Cir. 1989)). The plaintiff's speech would impair the employer's interests where the speech:

(1) 'impair[ed] discipline by superiors'; (2) 'impair[ed] ... harmony among co-workers'; (3) 'ha[d] a detrimental impact on close working relationships for which personal loyalty and confidence are necessary'; (4) 'impede[d] the performance of the speaker's duties'; or (5) 'interfere[d] with the regular operation of the enterprise.' ... These interests are referred to collectively as 'disruption.'

*Id.* (citing *Versarge*, 984 F.2d at 1366 (quoting *Rankin*, 483 U.S. at 388, 107 S.Ct. 2891) (alterations in Versarge); *Rode*, 845 F.2d at 1202). In addition, the court must determine "whether [McCormick] knowingly or recklessly made false statements and whether her speech was motivated by animus." *Id.* (citing *Czurlanis*, 721 F.2d at 106).

"*In Waters*, ..., the [Supreme] Court decided that 'the *potential* disruptiveness of the speech as reported was enough to outweigh whatever First Amendment value it might have had.' " *Watters*, 55 F.3d at 896 (citing *Waters v. Churchill*, 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (emphasis added)). Therefore, in the Third Circuit, "after *Waters*, it is no longer essential to show actual disruption, although such evidence would obviously be highly relevant." *Id.* (citing *Jeffries v. Harleston*, 52 F.3d 9 (2d Cir.1995) (emphasis added)).

In the case before the court, according to the findings of fact determined by the hearing officer, approved by the Board of Education, and affirmed by the Superior

Court, McCormick's acts of sending the electronic mail messages were listed among other acts of insubordination against the DPI. These findings entailing the concerns of plaintiff's former employer implicate many of the factors listed above, including (1) impaired discipline, (4) impeded speaker performance, and (5) interference with regular operations.

On the other hand, analyzing the communications as between the plaintiff and the defendants' supervision—since the plaintiff and defendants worked in different state agencies and plaintiff's comments were addressed to defendants' state agency employer—there is little threat to the government's interest in efficiency or effectiveness. The parties in the instant case did not work together and did not have a working relationship so trust and harmony among co-workers and interference with regular operations are not implicated by McCormick's comments to DNREC upper management. Therefore, plaintiff's interest in freedom of speech and the community's interest in plaintiff having and exercising that freedom outweighs the government interest in the efficiency of its operation. To the extent that her comments concerned matters of land use and possible discriminatory practices, DNREC's operational effectiveness potentially could be enhanced by plaintiff's comments. Therefore, the balance is tipped toward protecting McCormick's speech in this matter.

Consequently, the court finds that plaintiff's interest in having free expression on a matter of public concern outweighs any threatened impairment to the State government's interest in the efficient and effective provision of services. Therefore, plaintiff's speech is worthy of constitutional protection, as a matter of law.

### 3. Substantial or Motivating Factor

The next issue before the court is whether the record shows a material issue of fact as to whether McCormick's complaint was a substantial or motivating fac-

tor in the DPI's decision not to renew plaintiff's employment contract. The Supreme Court explained this requirement as follows:

> The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

*Mt. Healthy City Sch. Dist. of Educ.*, 429 U.S. at 285–86, 97 S.Ct. 568.

Though this court is precluded from reconsidering the Superior Court's judgment that sufficient evidence was produced to find that McCormick was discharged as a result of her own misconduct, plaintiff in the instant case has adduced sufficient evidence to allege that her discharge was the goal of the defendants in retaliation for plaintiff's exercise of her First Amendment right of free speech. Indeed, the Superior Court opinion states that prior to the loss of her DPI contract, plaintiff's qualifications for her position as well as her job performance were not an issue. In addition, plaintiff had held her position with the DPI for eight years. Nevertheless, under certain circumstances, even a "borderline or marginal" employee would have the right to engage in constitutionally protected conduct without it impacting his or her performance evaluation. Yet, according the record, plaintiff was neither a "borderline or marginal" employee.

Furthermore, plaintiff has alleged a chronological chain of events starting with her communication regarding perceived gender discrimination by Jefferson and

ending with the decision not to renew her employment contract. The reasons set forth in the notice from the Board regarding its recommendation that plaintiff's contract not be renewed and the hearing officer's findings of fact both have been shown to mirror information communicated by the defendants to plaintiff's supervisor.

Therefore, the court finds that plaintiff has adduced sufficient evidence to raise a genuine issue of material fact as to whether McCormick's complaint against Jefferson was a motivating factor in the decision not to renew her employment contract. Consequently, plaintiff has satisfied this second requirement for establishing a First Amendment retaliation claim.

### 4. Government Retaliation

Third, "defendants may defeat plaintiff's claim by demonstrating by a preponderance of the evidence that the same action would have been taken even in the absence of the protected conduct." *Watters,* 55 F.3d at 896 (citing *Mt. Healthy City Sch. Dist. of Educ.,* 429 U.S. at 287, 97 S.Ct. 568). The issue before this court, at summary judgment, is whether sufficient evidence has been adduced to raise a genuine issue of material fact as to whether McCormick would have been discharged for other reasons in the absence of her complaint regarding defendant Jefferson's alleged gender discrimination so that the question of the actual reason for McCormick's termination may go to a jury. *Id.*

In the instant case, defendants point to the results of plaintiff's contract renewal hearing to argue that McCormick's contract was not renewed because of her own insubordination. On the other hand, plaintiff alleges that the conduct of the defendants in response to her complaint of gender discrimination caused her termination. Consequently, "[w]hether the speech was a substantial factor in the retaliatory action and whether [McCormick] would have been fired anyway remain issues in contention between the parties." *Id.* at 892 (citing *Johnson v. Lincoln Univ.,* 776 F.2d 443, 454 (3d Cir.1985); *Zamboni v. Stamler,* 847 F.2d 73, 79 n. 6, 80 (3d Cir.)).

The court finds that, based on the current record, a reasonable jury could find that plaintiff's contract would have been renewed if she had not complained to DNREC upper management about gender discrimination by defendant Jefferson. *Azzaro,* 110 F.3d at 981. Accordingly, regarding plaintiff's First Amendment retaliation claim, summary judgment in favor of the defendants is denied.

### E. Fourteenth Amendment: Equal Protection Gender Discrimination Claim

The plaintiff asserts that the alleged acts of the defendants were performed under color of state law and were motivated by her gender, constituting discrimination on the basis of sex. At oral argument, plaintiff stated that the factual basis for this claim starts with Jefferson's statement to McCormick that he would rather speak to a man. Plaintiff interprets this statement as meaning that Jefferson did not want to speak with or deal with a woman. Plaintiff filed a complaint with the Office of Civil Rights that recounts her encounter with the defendants. Plaintiff asserts that defendants McDaniel and Hill were aware of McCormick's charge of gender discrimination against Jefferson. She also asserts that defendants ignored her complaint.

It has been held "that the equal protection clause contains a 'federal constitutional right to be free from gender discrimination' that does not 'serve important governmental objectives' and is not 'substantially related to those objectives.'" *Bohen v. City of East Chicago,* 799 F.2d 1180, 1185 (7th Cir.1986) (quoting *Davis v. Passman,* 442 U.S. 228, 234–35, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979)). "To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiff[ ] must prove the existence of purposeful discrimination." *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1478 (3d Cir.1990) (citing

*Batson v. Kentucky,* 476 U.S. 79, 93, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)). Accordingly, McCormick "must demonstrate that [she] 'receiv[ed] different treatment from that received by other individuals similarly situated.'" *Id.* (quoting *Kuhar v. Greensburg–Salem Sch. Dist.,* 616 F.2d 676, 677 n. 1 (3d Cir.1980)). "Specifically to prove sexual discrimination, a plaintiff must show that any disparate treatment was based upon her gender." *Id.* (citing *Bohen,* 799 F.2d at 1186–87).

█ In her complaint, McCormick charges all of the defendants with gender discrimination in violation of the equal protection clause. Nevertheless, "[s]upervisory liability cannot be based solely upon the doctrine of respondeat superior, but there must be some affirmative conduct by the supervisor that played a role in the discrimination." *Andrews* 895 F.2d at 1478 (citing *Rizzo v. Goode,* 423 U.S. 362, 377, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976)). Moreover, "[t]he necessary involvement can be shown in two ways, either 'through allegations of personal direction or of actual knowledge and acquiescence,' or through proof of direct discrimination by the supervisor." *Id.* (quoting *Rode,* 845 F.2d at 1207).

In the case of *Keenan v. City of Philadelphia,* 983 F.2d 459, 464 (3d Cir.1992), the Court of Appeals for the Third Circuit addressed the issue of sufficiency of evidence to support an equal protection claim of gender discrimination in the context of reviewing the denial of a motion for judgment as a matter of law. Consequently, the standard of review in that matter entailed "drawing all reasonable inferences in favor of the verdict winner" and affirming the denial of the motion "unless the record [was] critically deficient of that minimum of evidence from which the jury might reasonably afford relief." *Id.* at 464–65. Though the evidence presented in that case was deemed more than sufficient to satisfy the evidentiary minimum to establish an equal protection gender discrimination claim, it is indicative of the type of evidence necessary to establish such a claim. Therefore, in the instant case, though such a quantum of evidence is not required, a comparison with *Keenan* demonstrates McCormick's failure to produce the *type* of evidence sufficient to establish a claim of gender discrimination. There the record included specific incidents that demonstrated that the defendant "treated [the female plaintiff] differently from other individuals similarly situated and did so based upon her gender." *Id.* at 465. For example, the female plaintiff in *Keenan* asserted that she was not given an overnight assignment, because she purportedly had a child at home. In fact, the plaintiff had no such child living with her. Nevertheless, her male counterparts who were given the overnight assignment did have minor children at home. *Id.*

█ Here, it is clear that McCormick has not adduced sufficient evidence to make out a gender discrimination claim based on the equal protection clause. Plaintiff has not adduced evidence that defendants treated her differently based on her gender verses their treatment of others similarly situated. McCormick alleges that Jefferson expressed his preference to deal with a man verses plaintiff and that he only dealt with McCormick once she convinced Jefferson that he had no other choice. Though the necessity of such a demand is repugnant, plaintiff does not further allege that the manner in which Jefferson administered the citations against McCormick's mobile home park was different from the way he handled similar situations. Here, the Court finds implicitly that McCormick has not established sufficient evidence to connect Jefferson's alleged assault and detention of plaintiff with his expressed preference to deal with men.

Therefore, plaintiff has not brought forth evidence of the type required by applicable case law to establish a gender discrimination claim based on the equal protection clause. Accordingly, defen-

dants' motion for summary judgment regarding plaintiff's gender discrimination claim is granted.

### III. Claims Brought Pursuant to Sections 1985 and 1986: Equal Protection Claim

In the second count of her complaint, McCormick alleges that the defendants violated 42 U.S.C. §§ 1985 and 1986 "by conspiring to deprive [plaintiff] of her right to equal protection of the laws on the basis of her gender, and/or by neglecting and/or refusing to prevent said deprivation," when the defendants conspired to have defendant Jefferson assault and detain McCormick and defendants Hill and McDaniel neglected to intervene. Further, plaintiff grounds her § 1985 claim upon the First Amendment, when she alleges that the defendants conspired against her to assault and detain her and to provide false and damaging information to plaintiff's employer in retaliation for her complaint to defendants' upper management concerning Jefferson's alleged gender bias.[12]

#### A. Section 1985(3) Conspiracy Claim

To come within the legislation a complaint must allege that the defendants did (1) 'conspire or go in disguise on the highway or on the premises of another' (2) 'for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.' It must then assert that one or more of the conspirators (3) did, or caused to be done, 'any act in furtherance of the object of (the) conspiracy,' whereby another was (4a) 'injured in his person or property' or (4b) 'deprived of having and exercising any right or privilege of a citizen of the United States.'

*Griffin v. Breckenridge,* 403 U.S. 88, 102–03, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

"The motivation aspect of § 1985(3) focuses not on scienter in relation to deprivation of rights but on invidiously discriminatory animus." *Id.* at 102 n. 10, 91 S.Ct. 1790.

> The constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law can be avoided by giving full effect to the congressional purpose—by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment.... The language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all.

*Griffin,* 403 U.S. at 102, 91 S.Ct. 1790.

The Supreme Court reiterated in *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 267–70, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993), that " '[d]iscriminatory purpose,' ..., 'implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker ... selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.' " Id. at 271–72, 113 S.Ct. 753 (quoting *Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979)). "The same principle applies to the 'class-based, invidiously discriminatory animus' requirement of § 1985(3)." *Id.*

In addition to this "animus" requirement, plaintiff must establish that she is a

---

12. In this latter instance, McCormick attempts to allege an equal protection claim which seems to merely restate her First Amendment retaliation claim. *Grossbaum v. Indianapolis–Marion County Bldg. Auth.,* 100

F.3d 1287, 1295 (7th Cir.1996) (citations omitted). The Equal Protection Clause, however, "does not establish a general right to be free from retaliation." *Id.* at 1296 n. 8.

member of a class cognizable under § 1985(3). In *Pendrell v. Chatham College,* 386 F.Supp. 341, 348 (W.D.Pa.1974), the court addressed whether § 1985 could support a cause of action for sex discrimination. The court reasoned that

> [s]ince § 1985 equally draws its validity from the Fourteenth Amendment as well as the Thirteenth Amendment, and even though the Thirteenth Amendment is applicable only to discrimination against black persons and not to discrimination against women, [we] will hold that it will. In this instance the Thirteenth Amendment's restrictiveness is overborne by the all-inclusive effect of the Equal Protection clause of the Fourteenth Amendment.

*Id.* Similar reasoning was used by the Court of Appeals for the Third Circuit in the case of *Richardson v. Miller,* 446 F.2d 1247 (3d Cir.1971), where a white male alleged that the "racial, or perhaps otherwise class-based invidiously discriminatory animus" required by *Griffin* was met when his employment was terminated due to his criticism of racially discriminatory employment practices against blacks. The court held that

> [w]hile the question is very close, particularly because unlike *Griffin* the plaintiff is not a member of the class allegedly discriminated against, we have concluded that, in light of the trend in recent decisions to 'accord (to the civil rights statutes) a sweep as broad as (their) language,' and in light of the standard by which these allegations must be viewed when faced with a motion under Rule 12 of the Federal Rules of Civil Procedure, the question must here be answered in the affirmative.

*Richardson,* 446 F.2d at 1249 (quoting *Griffin,* 403 U.S. at 97, 91 S.Ct. 1790).

In a recent case, the Third Circuit followed this "flexible" approach to interpreting § 1985 as to its cognizable classes, again in a Rule 12(b)(6) context, when it held that the plaintiff's status as a mentally retarded person placed her within such a cognizable class. *Lake v. Arnold,* 112 F.3d 682, 688 (3d Cir.1997). To support this holding the court cited its opinion in the case of *Novotny v. Great American Federal Savings and Loan Association,* 584 F.2d 1235 (3d Cir.1978). The court noted that notwithstanding the fact that the holding of the case—that Title VII could be a source of rights protected by § 1985—was vacated by the Supreme Court in *Great American Federal Savings and Loan Association v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), the other holding in the case that women as a class are protected by § 1985(3) was still valid. *Lake,* 112 F.3d at 686 n. 6. The court explained that "[i]n *Novotny,* [it] relied on Congress' characterization of classifications based on gender as inherently invidious and upon the immutable nature of gender to conclude that women, as a class, were entitled to the protection of section 1985(3) . . . ." *Id.* at 687.

■ In applying these principles to the instant case, though the law of the Third Circuit allows for the recognition of women as a cognizable class in an appropriate § 1985(3) claim, the court finds that McCormick's section 1985(3) claim must fail. The present record will not support a reasonable jury finding that defendants possessed the requisite invidiously discriminatory animus required to make out such a claim. As in *Bray,* the current state of the record does not sufficiently demonstrate that defendants' actions were "motivated by a purpose (malevolent or benign) directed specifically at women as a class. . . ." *Bray,* 506 U.S. at 267–70, 113 S.Ct. 753.

McCormick claims that her right to be free from gender discrimination was violated when defendants conspired to have defendant Jefferson assault and detain her. Plaintiff points to Jefferson's statement to her that he preferred to speak with a man concerning the conditions at the trailer park, in order to allege Jefferson's bias

against plaintiff's gender. Therefore, the court interprets plaintiff's complaint as stating that Jefferson felt it was inappropriate for a woman to be involved in such matters or that defendant did not want to deal with women in such matters. Nevertheless, plaintiff admits that Jefferson proceeded to deal with plaintiff regarding the mobile home park, as a result of McCormick's demand that he do so. Yet, in order to make out her § 1985(3) claim, plaintiff must produce sufficient evidence that Jefferson's bias against women motivated the conspiracy to assault and detain her. *Griffin*, 403 U.S. at 102, 91 S.Ct. 1790.

The court finds that McCormick has not produced the evidentiary basis for establishing that the requisite discriminatory intent motivated the conspiracy to assault and detain plaintiff. Though, arguably, plaintiff has adduced evidence that may demonstrate the existence of a personal dispute between plaintiff and defendants that implicates certain of her constitutional rights, this showing is not sufficient to survive summary judgment on a section 1985(3) claim.

This court must give full effect to the congressional purpose of requiring class-based, invidiously discriminatory animus behind defendants' actions to avoid interpreting the section as a general federal tort law. *Griffin*, 403 U.S. at 102, 91 S.Ct. 1790. Plaintiff has failed to provide sufficient evidence to raise a genuine issue of material fact that defendants actions were chosen "at least in part *because of*, not merely in spite of," their adverse effect on women as a class. *See Bray*, 506 U.S. at 271–72, 113 S.Ct. 753 (emphasis added).

In addition, to establish a claim pursuant to section 1985(3), plaintiff must adequately assert that the purpose of defendants' conspiracy was to deprive plaintiff of certain of her constitutional rights. As explained by the Supreme Court,

> it does not suffice for application of § 1985(3) that a protected right be incidentally affected. A conspiracy is not

'for the purpose' of denying equal protection simply because it has an effect upon a protected right. The right must be 'aimed at [. . .;]' its impairment must be a conscious objective of the enterprise. Just as the 'invidiously discriminatory animus' requirement . . . requires that the defendant have taken his action 'at least in part because of, not merely in spite of, its adverse effects upon an identifiable group,' so also the 'intent to deprive of a right' requirement demands that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it.

*Id.* at 275, 113 S.Ct. 753 (internal citations and quotation marks omitted.)

Consequently, not only has plaintiff failed to produce evidence that defendants conspired to assault and detain plaintiff "at least in part because of" her gender, but she has not shown that defendants targeted her as a woman with the aim of depriving her of the type of right protected by section 1985(3). Again, the deprivation of the right must be the aim of the conspiracy—even a known incidental impact upon such right is not sufficient. Section 1985(3) applies to conspiracies "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). McCormick has not specifically alleged nor has she sufficiently established that defendants acted with the aim of depriving plaintiff of a constitutional right within the scope of § 1985(3). Therefore, defendants' motion for summary judgment regarding plaintiff's section 1985(3) claim is granted.

**B. Section 1986 Claim**

██ "[Section] 1986 constitutes an additional safeguard for those rights protected under 42 U.S.C. § 1985, and 'transgressions of § 1986 by definition depend on a

preexisting violation of § 1985....' " *Clark v. Clabaugh,* 20 F.3d 1290, 1295 (3d Cir. 1994) (quoting *Rogin v. Bensalem Twp.,* 616 F.2d 680, 696 (3d Cir.1980)). "[A] § 1986 plaintiff must show that: (1) the defendant had actual knowledge of a § 1985 conspiracy, (2) the defendant had the power to prevent or aid in preventing the commission of a § 1985 violation, (3) the defendant neglected or refused to prevent a § 1985 conspiracy, and (4) a wrongful act was committed." *Id.* at 1295–96 (citing *Perez v. Cucci,* 725 F.Supp. 209, 254 (D.N.J.1989) (citations omitted), *aff'd,* 898 F.2d 142 (3d Cir.1990)).

Due to the derivative nature of a § 1986 claim, because the court has granted summary judgment in favor of defendants regarding plaintiff's § 1985(3) claim, defendants' motion for summary judgment regarding plaintiff's § 1986 claim is granted.

## IV. State Law Claims

### A. Assault and Battery

Plaintiff contends that Jefferson, individually, and defendants, collectively, committed a variety of torts against her that are recognized by Delaware state law. First among them is the tort of assault and battery. According to McCormick, Jefferson committed this transgression when he grabbed her by the arm during the confrontation in the parking lot.

■ According to Delaware law, civil assault and battery is defined as follows: "[a]n assault is the attempt by a person, in a rude and revengeful manner, to do an injury to another person, coupled with the present ability to do it. A battery consists in the doing, in an angry, rude, and revengeful manner, of an injury to another person." *St. Anthony's Club v. Scottsdale Ins. Co.,* No. CIV.A. 97C–07–112JOH, 1998 WL 732947, at *3 (Del.Super. July 15, 1998) (citing *Hendle v. Geiler,* 50 A. 632 (Del.Super.1895)).

■ McCormick alleges that Jefferson injured her by grabbing her arm in a tight, wrenching grip, causing plaintiff to suffer "physical, mental, and emotional injury and severe mental anguish." Further plaintiff alleges that Jefferson changed and tightened his grip on her arm each time she demanded him to stop. To substantiate this claim McCormick has submitted evidence in the form of a physician's report from her treatment the next morning in the emergency room of a local hospital. Notes by the attending physician state that the formation of the contusions on plaintiff's arm was consistent with a right-handed grip.

This is sufficient evidence to establish the elements of a claim of assault and battery according to state law. Therefore, defendant Jefferson's motion for summary judgment on this claim is denied.

### B. False Imprisonment

■ Plaintiff next maintains that defendant Jefferson falsely imprisoned her when he forcibly directed her to a certain area in the parking lot. "The essence of a cause of action for false imprisonment, sometimes called false arrest, is unlawful detention." *Pagano v. Hadley,* 553 F.Supp. 171, 175 (D.Del.1982). "It protects the personal interest in freedom from restraint of movement." *Id.* (citing Prosser, *Law of Torts* § 11, at 42 (1971); *Nesmith v. Alford,* 318 F.2d 110, 118–19 (5th Cir. 1963); *Chrisco v. Shafran,* 525 F.Supp. 613, 616 (D.Del.1981)).

Citing the Restatement (Second) Torts §§ 35 and 36(3), Jefferson argues that plaintiff "was not confined in any way." Moreover, defendant cites § 36(3) of the Restatement which states that "[t]he actor does not become liable for false imprisonment by intentionally preventing another from going in a particular direction in which he has a right to go."

■ "An actor is liable for false imprisonment if: (a) he acts intending to confine the other or a third person within boundaries fixed by the actor, and (b) his act directly or indirectly results in such a con-

finement of the other, and (c) the other is conscious of the confinement or is harmed by it." *Krochalis v. Insurance Co. of North America*, 629 F.Supp. 1360, 1370 (E.D.Pa.1985) (citing *Gagliardi v. Lynn*, 446 Pa. 144, 285 A.2d 109 (1971) (quoting Restatement (Second) of Torts § 35)).

■ Moreover, "[t]he confinement within the boundaries fixed by the defendant must be complete; if there is a known, safe means of escape, involving only a slight inconvenience, there is no false imprisonment." *Id.* (citing *Chicarelli v. Plymouth Garden Apartments*, 551 F.Supp. 532, 541 (E.D.Pa.1982)). Section 36(3), entitled "What Constitutes Confinement," establishes that the confinement must be "complete." Therefore, even though a person is prevented from going in a particular direction, if he or she is able to go in another direction—making the confinement incomplete—that person cannot establish a cause of action for false imprisonment.

■ Plaintiff asserts that Jefferson falsely imprisoned her by wrongfully detaining her against her will. It is undisputed that Jefferson desired that McCormick proceed in specific direction, i.e., towards the public entrance. It is also undisputed that—though he would not allow plaintiff to proceed through the private entrance—she was allowed to proceed towards the public entrance. Therefore, the alleged confinement was not "complete." Consequently, plaintiff has failed to establish a claim for false imprisonment. Thus, defendant Jefferson's motion for summary judgment regarding this claim is granted.

## C. Intentional or Reckless Infliction of Emotional Distress

Plaintiff claims that defendants' actions in furtherance of their conspiracy to deprive her of her position with the DPI constituted the tort of intentional infliction of emotional distress. "A line of cases in Delaware has established the rule that the intentional infliction of emotional distress is an independent tort action which does not require an underlying impact or physical injury." *Pritchett v. Delmarva Builders, Inc.*, No. 97C–03–011, 1998 WL 283376, at *4 (Del.Super. Feb. 27, 1998): "These cases follow the view expressed in Restatement (Second) of Torts § 46(1) (1965) which sets out the elements of the action." *Id.* "The tort of the intentional infliction of mental distress is defined in Restatement of Torts 2d § 46(1) as follows: One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Avallone v. Wilmington Med. Ctr., Inc.*, 553 F.Supp. 931, 938 (D.Del.1982) (citing *King v. Government Employees Ins. Co.*, C.A. No. 75– 315 (D.Del.1978)).

"Liability only arises under the tort if the emotional distress inflicted is indeed severe."

The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity. Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct · is in itself important evidence that the distress has existed . . . .

*Mattern v. Hudson*, 532 A.2d 85, 86 (Del.Super.1987) (citing Restatement, § 46, comment j; *Ortiz v. Brandywine Chrysler–Plymouth, Inc.*, C.A. No. 674, 1977, at 4, 1985 WL 189010 (Del.Super. June 26, 1985)).

"[I]t is the court's responsibility to determine whether the defendant's conduct is so extreme and outrageous as to permit recovery." *Id.* (citing *Brandywine Chrysler, supra*, at 2, 1985 WL 189010; Restatement, § 46, comment h)). "Of course, where reasonable men might differ, it is for the jury to determine whether the

conduct has been sufficiently extreme and outrageous to result in liability." *Id.* (citing *Brandywine Chrysler, supra,* at 2–4, 1985 WL 189010).) "On a motion for summary judgment, the moving party must demonstrate that even when the facts are taken in a light most favorable to the nonmoving party, he is entitled to prevail as a matter of law." *Id.* (citing *Matas v. Green,* 171 A.2d 916 (Del.Super.1961)).

Using the Restatement Torts 2d § 46, Comment d [13], as a standard, the court in Avallone held that the defendant's conduct was, "as a matter of law, insufficient to constitute conduct 'so outrageous in character and so extreme in degree, as to be beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Avallone v. Wilmington Med. Ctr., Inc.,* 553 F.Supp. 931, 938 (D.Del.1982) (quoting Restatement Torts 2d § 46, Comment d). In *Avallone,* the plaintiff alleged that she was forced to resign from her job as a nurse, because she warned defendant's personnel of the problems with implementing a new patient feeding method. In that case, the plaintiff asserted that, as a result of her warning, she received "a false negative job performance evaluation" and was forced to resign. *Id.* at 932.

■■■ As in *Avallone,* the issue before this court is whether McCormick has adduced sufficient evidence from which a reasonable jury could find that defendants actions were both extreme and outrageous, and that McCormick's distress was both severe and reasonable under the circumstances. *Mattern,* 532 A.2d at 88 (citing Restatement, § 46, cmts. d and j; *Brandywine Chrysler, supra.*). Like the court in *Avallone,* this court finds as a

matter of law that defendants' actions pertaining to plaintiff's employment contract do not meet the Restatement's standard of extreme and outrageous behavior. In addition, regarding Jefferson's actions in allegedly assaulting McCormick and all the defendants' alleged participation in procuring the termination of plaintiff's employment contract, plaintiff has failed to produce any evidence that she experienced *any* severe emotional distress resulting from defendants' conduct. Therefore, defendants' motion for summary judgment on this claim is granted.

## D. Negligent Infliction of Emotional Distress

The next tort plaintiff attributes to defendants is that of negligent infliction of emotional distress. This she contends was the result of Jefferson's individual action in the parking lot and defendants' conspiracy to assault and detain plaintiff and to terminate her employment contract.

■■■ "An essential element of [the tort of negligent infliction of mental distress] is that the victim not only suffer mental stress, but also bodily injury or sickness." *Avallone v. Wilmington Med. Ctr., Inc.,* 553 F.Supp. 931, 938 (D.Del. 1982) (citing *Robb v. Pennsylvania R.R. Co.,* 210 A.2d 709 (Del.1965); *Cosgrove v. Beymer,* 244 F.Supp. 824 (D.Del.1965)). Defendants cite *Robb,* which discussed "the right to recover for the physical consequences of fright in the absence of an impact and contemporaneous physical injury." 210 A.2d at 711. There the court held that "where negligence proximately caused fright, in one within the immediate area of physical danger from that negligence, which in turn produced physical

---

13. Comment d goes on to state:

> [l]iability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime, plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt. There must still be freedom to express an unflattering opinion....

> *Avallone,* 553 F.Supp. at 938 (quoting Restatement Torts 2d § 46, cmt. d) (quotation marks omitted).

consequences such as would be elements of damage if a bodily injury had been suffered, the injured party is entitled to recover...." *Id.* at 714–15. This case is inapplicable to the instant case, as *Robb* pertains to fact situations where the plaintiffs are located in the "zone of danger." Here, McCormick asserts that she was the direct target of defendants' actions.

Nevertheless, McCormick and the defendants disagree on the question of whether plaintiff has adduced evidence of the type of injury necessary to make out a claim of negligent infliction of emotional distress. Delaware case law answers this question by stating that "[t]o support such a claim, the plaintiff must provide evidence of a present physical injury." *Lupo v. Medical Ctr. of Delaware, Inc.,* No. Civ.A. 94C–09–049, 1996 WL 111132, at *2 (Del.Super. Feb.7, 1996) (citing *Garrison v. Medical Ctr. of Delaware,* Inc., 581 A.2d 288, 293 (Del.1989); *McKnight v. Voshell,* No. 168, 1986 WL 17360 (Del. August 6, 1986) (Order); *Mergenthaler v. Asbestos Corp. of Am.,* 480 A.2d 647, 651 (Del.1984); *Robb v. Pennsylvania R.R. Co.,* 210 A.2d 709 (Del.1965); *Cooke v. Pizza Hut, Inc.,* C.A. No. 93C–03–029, 1994 WL 680051 (Del.Super. October 3, 1994) (memorandum opinion)). The court in *Lupo* explained that the

case [was] distinct from those emotional distress cases where an injury to a third person caused a plaintiff mental anguish or where a sudden, unexpected incident caused a plaintiff fright or shock. Rather, plaintiffs in this case allegedly suffered direct injuries due to the negligence of the defendants. Hence, emotional distress cases which deny recovery because the plaintiff was not in the 'immediate zone of physical risk' are not applicable. Instead the physical injury requirements in those cases where a defendant's negligent acts directly caused the alleged injuries establish the standard.

*Id.* (citing *Robb, supra; Cosgrove,* 244 F.Supp. at 824).

The court in *Lupo* cited the Restatement (Second) of Torts, § 436A for this standard.[14] Using this standard the court held that "where the physical phenomena accompanying emotional disturbance are transitory and non-recurring they do not amount to the physical injury needed for recovery under a negligent infliction of emotional distress claim." *Id.* In the case at bar, McCormick asserts in her complaint that as a result of the negligent infliction of emotional distress allegedly resulting from defendants' actions, she has suffered "physical and mental injury, emotional distress, and mental anguish, both temporary and permanent."

To support this claim, McCormick has produced medical records documenting contusions to her arm, consistent with a wrenching grip to her arm, allegedly resulting from her confrontation with defendant Jefferson. This injury to McCor-

---

**14.** "The Restatement (Second) of Torts, § 436A reads as follows: If the actor's conduct is negligent as creating an unreasonable risk of causing either bodily harm or emotional disturbance to another, and it results in such emotional disturbance alone, without bodily harm or other compensable damage, the actor is not liable for such emotional disturbance." *Lupo,* 1996 WL 111132 at *3.

The court then cited Subsection (c) of § 436A as clarifying this Rule by providing: The rule stated in this Section applies to all forms of emotional disturbance, including temporary fright, nervous shock, nausea, grief, rage, and humiliation. The fact that these are accompanied by transitory, nonrecurring physical phenomena, harmless in themselves, such as dizziness, vomiting, and the like, does not make the actor liable where such phenomena are in themselves inconsequential and do not amount to any substantial bodily harm. On the other hand, long continued nausea or headaches may amount to physical illness, which is bodily harm; and even long continued mental disturbance, as for example in the case of repeated hysterical attacks, or mental aberration, may be classified by the courts as illness, notwithstanding their mental character. This becomes a medical or psychiatric problem, rather than one of law.

*Id.*

mick's arm is not a "physical phenomena accompanying emotional disturbance." Indeed, plaintiff's physical injury to her arm is the direct result of the alleged grip by defendant Jefferson. This injury did not result from an emotional disturbance resulting from McCormick's encounter with Jefferson.

Furthermore, McCormick cites no evidence to support her claim of mental stress or physical injury resulting from defendants' alleged actions pertaining to the non-renewal of plaintiff's employment contract. Therefore, defendants' motion for summary judgment pertaining to plaintiff's claim of negligent infliction of emotional distress is granted.

## E. Tortious Interference with Contract

■ Plaintiff's final contention is that defendants tortiously interfered with her contract with the DPI. The widely recognized tort of intentional interference with a contract entails the following elements: "[t]here must be (1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury." *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del.Ch.1987) (citing Restatement of Torts (Second) § 766 (1977); *Bowl–Mor Co., Inc. v. Brunswick Corp.*, 297 A.2d 61, 64 (Del.Ch.1972); *Pennzoil Co. v. Getty Oil Co.*, C.A. No. 7425, slip op. at 42–43, 1984 WL 15664 (Del. Ch. February 6, 1984)).

Predominantly, to survive summary judgment, McCormick "must demonstrate that the [defendants] breached a valid and enforceable contract thereby causing [her] injury." *Hursey Porter & Assoc. v. Bounds*, Civ.A. No. 93C–01–091, 1994 WL 762670, at *13 (Del.Super. Dec. 2, 1994) (citing *Irwin & Leighton, Inc.*, 532 A.2d at 992). In the instant case, there is no dispute as to the existence of McCormick's contract with the DPI. There is a dispute between the parties as to whether defendants had any knowledge of plaintiff's em-

ployment contract. Nevertheless, at oral argument, it was conceded that defendants knew that McCormick was an employee of the DPI.

As for the next element of the cause of action, "[a] defendant acts intentionally by desiring his act to cause the breach or by being substantially certain that the act will result in a breach." *Layfield v. Beebe Medical Ctr., Inc.*, No. Civ.A. 95C–12–007, 1997 WL 716900, at *5 (Del.Super. July 18, 1997) (citing Restatement (Second) of Torts, § 8A, § 766, cmt. j (1977)). In viewing the evidence in a light most favorable to the non-moving party, plaintiff has established defendants' intent to "reel in" McCormick—by allegedly seeking the termination of her employment contract with the DPI—through evidence including defendants' comments and actions, as well as the timing of such actions.

As for the fourth element, "Delaware courts have applied the rule set forth in the Restatement (Second) of Torts § 767 (1979)." *Hursey*, 1994 WL 762670 at *13 (citations omitted). "The term 'improper,' as used in § 767, has essentially the same meaning as 'without justification' or 'without privilege.'" *Id.* at *14 (citing Restatement (Second) of Torts § 766 at 4–7 (1979) (introductory note § 766)). "Intentional torts involving a claimed violation of a right to prospective economic advantages inevitably involve a complex normative judgment relating to justification." *Irwin*, 532 A.2d at 992. "The normative judgment whether pursuit of self-interest justified one in inducing another to breach a contract in the particular circumstances presented inevitably involves an evaluation of many factors. Section 767 of the Second Restatement of Torts identifies the following types of consideration relevant to such a judgment." *Id.*

■ "In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following fac-

tors [15]: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties." *Irwin*, 532 A.2d at 993.

◼ In applying these factors to the instant case, factors (b), (d), and (f) are particularly relevant to the facts as alleged by McCormick and to the determination of whether or not the defendants' acted improperly or without justification. Regarding factor (b), plaintiff asserts that the defendants' motive in taking the alleged actions was mere retaliation. Plaintiff asserts that defendants were motivated by a desire to interfere with her employment contract in retaliation for plaintiff's complaint against Jefferson for alleged gender discrimination. Therefore, plaintiff claims that defendants were not asserting legitimate self-interests in seeking the termination of her employment contract, and

thus defendants' actions were not justified, according to factor (d).

Lastly, as for factor (f), plaintiff has sufficiently established that defendants moved with dispatch to seek the termination of plaintiff's employment contract. At this stage in the proceeding, at least, plaintiff has established that there was an immediate and direct chain of events initiated by the defendants that led to an immediate interference or termination of plaintiff's employment contract. In addition, this contention establishes the fifth and final element in stating a claim of tortious interference with contract, i.e., injury.

Whereas plaintiff contends that defendants caused the termination of her employment contract, defendants point to the findings of fact, recommended by the hearing officer, accepted by the Board of Education, and affirmed by the Superior Court, to allege that plaintiff's contract was not renewed due to her own misconduct. Defendants argue that their actions in reporting waste of State resources was in fact laudable.

Laudable though these actions may have been, there is a factual dispute regarding

---

**15.** In *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 993 (Del.Ch.1987), these factors were enumerated as follows:

(a) The Nature of the Actor's Conduct. This factor focuses upon the means utilized by the actor in causing the interference. *Hursey*, 1994 WL 762670 at *14 (citing Restatement (Second) of Torts § 767 cmt. c (1979))[;] (b) [t]he Actor's Motive. The comment to this provision states that in evaluating the actor's conduct: [I]t may become very important to ascertain whether the actor was motivated, in whole or in part, by a desire to interfere with the other's contractual relations. If this was the sole motive the interference is almost certain to be held improper. *Id.* at *15 (citing Restatement (Second) of Torts § 767 cmt. d (1979))[;] (c) The Interests of the Other with which the Actor's Conduct Interferes. This factor permits the Court to consider whether the underlying relationship with which the actor interfered was one which violates public policy such as to justify the actor's inducement of a breach; *Id.* (citing Restate-

ment (Second) of Torts § 767 cmt. e (1979))[;] (d) The Actor's Interest. This factor focuses upon the interest that the actor seeks to promote through interference with another's contractual or prospective contractual relationship. *Id.* (citing Restatement (Second) of Torts § 767 cmt. f (1979))[;] (e) The Social Interests. This factor permits the Court to consider the social utility of the interests sought to be advanced by each of the litigants. *Id.* (citing Restatement (Second) of Torts § 767 cmt. g (1979))[;] (f) Proximity or Remoteness of Actor's Conduct to Interference. This factor considers whether the interference was an immediate or remote consequence of the actor's conduct. *Id.* at *16 (citing Restatement (Second) of Torts § 767 cmt. h (1979)). If the interference is immediate, the conduct is more likely to be considered improper[;] (g) Relations Between the Parties. This final factor permits the Court to consider the relationship between any of the parties involved in the dispute. *Id.* (citing Restatement (Second) of Torts § 767 cmt. I (1979)).

defendants' intent and regarding the causation of the lack of renewal of plaintiff's employment contract. Therefore, summary judgement on McCormick's claim of tortious interference with her contract is precluded. Defendants' motion for summary judgment regarding this claim is denied.

## V. Qualified Immunity[16]

### A. Qualified Immunity: General Principles

Defendants argue that, to the extent that plaintiff has established a valid § 1983 claim, they are shielded from liability by the defense of qualified immunity. "In *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Beckett v. Department of Corrections of the State of Delaware*, 981 F.Supp. 319, 329 (D.Del. 1997). "This standard developed from the Court's general premise that government officials are entitled to some degree of immunity to avoid unacceptable interference with their duties and the hindrances possibly associated with threats of liability." *Id.* (citing *Harlow*, 457 U.S. at 806, 102 S.Ct. 2727). "The Supreme Court considered discretionary functions those in which the surrounding judgments 'almost inevitably are influenced by the decision maker's experiences, values, and emotions.'" *Id.* (citing *Harlow*, 457 U.S. at 816, 102 S.Ct. 2727).

Nevertheless, there is a condition precedent to this legal determination which is explained in the case of *Wiers v. Barnes*, 925 F.Supp. 1079, 1085 (D.Del.1996) (citations omitted), as follows:

> [w]hether qualified immunity exists is a question of law to be determined by the [c]ourt. When the material facts are not in dispute, the district court may decide whether the government official is shielded by qualified immunity. However, notwithstanding the fact that the initial determination is one of law to be made by the court, a jury should decide the disputed factual issues relevant to that determination. The first part of this test is purely a question of law, but the latter part of the test requires application of the law to the particular conduct at issue, an inquiry which may require factual determinations if the nature of conduct is disputed.

The Court of Appeals for the Third Circuit in *Sharrar v. Felsing*, 128 F.3d 810, 828 (3d Cir.1997) (citations omitted), provides further guidance to the court in performing its inquiry through its holding "that in deciding whether defendant officers are entitled to qualified immunity it is not only the evidence of 'clearly established law' that is for the court but also whether the actions of the officers were objectively reasonable. Only if the historical facts material to the latter issue are in dispute ... will there be an issue for the jury." "This qualified immunity inquiry is an objective, fact-specific pursuit [in which] [d]efendants bear the burden of establishing the affirmative defense...." *Karnes v. Skrutski*, 62 F.3d 485, 491 (3d Cir.1995) (citing *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir.1992)).

---

**16.** The previous discussions regarding plaintiff's constitutional claims generally focused on whether or not such claims were established. Only plaintiff's Fourth Amendment excessive force and First Amendment retaliation claims remain for consideration regarding defendants' qualified immunity defense. This format is consistent with the Supreme Court's admonition that "[a] necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).

## B. Qualified Immunity: Section 1983 Claims

### 1.] Fourth Amendment Claim

■ Because Jefferson is singly implicated regarding plaintiff's Fourth Amendment excessive force claim, only Jefferson asserts the defense of qualified immunity regarding this claim. Defendant Jefferson argues that he is entitled to qualified immunity regarding plaintiff's Fourth Amendment claim, because he did not violate any of plaintiff's well established constitutional rights. While not conceding the point, for summary judgment purposes, he further contends that if he grabbed plaintiff, "[a] reasonable officer could easily believe that taking plaintiff by the arm was reasonable under the circumstances." In support of this position, defendant quotes plaintiff's testimony that "[t]here was a lot of activity; things were happening very quickly at that time."

On the other hand, plaintiff asserts that Jefferson assaulted her outside the Bridgeville Police Station without justification or provocation and that no reasonable person in defendant's position would have believed that he was not violating plaintiff's civil rights. Moreover, plaintiff asserts that defendant's use of force in a manner resulting in physical injury against a "defenseless, unarmed citizen was manifestly unreasonable."

In addition to those legal precepts outlined above, the Court of Appeals for the Third Circuit in *Karnes*,[17] provided specific guidance which is applicable to the type of case presently before the court. There the court stated that the first part of the qualified immunity analysis—whether the law was clearly established—is purely a question of law, but the second part—whether, given the state of the law, a reasonable officer could have believed his or her conduct was reasonable—entails the application of the law to the particular conduct at issue, which if disputed may require determinations of fact. *Karnes*, 62 F.3d at 491–92. The Third Circuit also noted that "[w]hile the qualified immunity defense is frequently determined by courts as a matter of law, a jury should decide disputed issues relevant to that determination." *Id.* at 491 (citations omitted).

As for the first part of the test, the court disagrees with defendant Jefferson. Indeed, there can be no doubt that McCormick possessed a clearly established right to be free from unreasonable seizure and excessive force. *House*, 824 F.Supp. at 490–91. Moreover, at the time the facts of this case occurred, it was clearly established Third Circuit law that the objective reasonableness standard be applied to conduct allegedly violative of the Fourth Amendment. *Wiers*, 925 F.Supp. at 1087 (citing *Karnes*, 62 F.3d at 491).

The second part of the analysis requires that the court determine whether Jefferson's actions were objectively reasonable. However, as indicated in the court's earlier discussion, regarding plaintiff's Fourth Amendment claim, the record in this case establishes the existence of a clear dispute regarding historical facts material to a determination regarding Jefferson's conduct in the parking lot. That is, there are two versions of what happened there—the plaintiff's on the one hand and the defendant's on the other hand. Given this state of the record, the court is not prepared to say that defendant Jefferson's conduct was objectively reasonable or that his conduct was objectively unreasonable.

In other words, for the reasons set forth earlier in this opinion during the discussion of plaintiff's Fourth Amendment excessive force claim, the court is, at this stage of these proceedings, unable to conclude that under the circumstances Jefferson should enjoy the protection of qualified

---

**17.** Though *Karnes* was decided in the context of a motion for judgment as a matter of law, the Third Circuit in that case cited the fact that "the standard for granting summary judgment mirrors the standard for a directed verdict." *Karnes v. Skrutski,* 62 F.3d 485, 494 n. 6 (3d Cir.1995) (quoting *Rotondo v. Keene Corp.,* 956 F.2d 436, 442 (3d Cir.1992)).

immunity. On the other hand, even though summary judgment rules require that the "[c]ourt must view all facts and inferences in the light most favorable to the party opposing the motion [, here the plaintiff]," *Robinson*, 987 F.Supp. at 283 (citation omitted), because there are material facts at issue, the court cannot conclude that the shield of qualified immunity should be removed from Jefferson. This is so because none of us will know as a matter of fact what transpired that September day, until a jury tells us.

Until a jury resolves the dispute regarding defendant's conduct, the court cannot determine as a matter of law the reasonableness of the force, if any, used by Jefferson or his good faith belief, or the lack thereof, in the reasonableness of his conduct. *Karnes*, 62 F.3d at 491–92; *House*, 824 F.Supp. at 490. Consequently, defendant Jefferson's motion for summary judgment wherein he asserts his entitlement to be shielded by the defense of qualified immunity as to plaintiff's Fourth Amendment excessive force claim is denied.

**2.] First Amendment Claim**

■ Defendants assert that they are entitled to qualified immunity "for all claims regarding alleged false statements made to plaintiff's supervisor," because the right to be "free from defamatory remarks in response to an exercise of First Amendment rights" was not clearly established as of the time the underlying events of this claim took place. On the other hand, plaintiff asserts that "[d]efendants, as State officials, used their influence with another State official who directly supervised [p]laintiff to secure the termination of [p]laintiff's employment based on defamatory statements." Moreover, plaintiff asserts that "[a]n obvious impetus for [d]efendants actions was [p]laintiff's complaint on September 10, 1996, to upper-level officials at DNREC about her treatment by Jefferson, who was Hill's and McDaniel's subordinate." Consequently, the court must determine whether, at summary judgment, defendants are entitled to qualified immunity for using their influence to seek the termination of plaintiff's employment contract by providing defamatory statements to plaintiff's supervisor in response to plaintiff's complaint to defendants' upper management regarding perceived gender discrimination by defendant Jefferson.

The first issue to be addressed is whether the right allegedly violated by defendants was "clearly established" at the time the incident took place. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "Despite the factual correspondence usually necessary to clearly establish the contours of a right, the Supreme Court has stated that a 'general constitutional rule already identified in the decisional law' may give fair warning to an official if the rule 'applies with obvious clarity to the specific conduct in question,' even though the specific issue has not previously been addressed." *Rappa v. Hollins*, 991 F.Supp. 367, 370–71 (D.Del.1997) (citing *United States v. Lanier*, 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)).

"The Third Circuit . . . has decided the law may be clearly established even if the court has not ruled on the issue and if there is some disagreement among the circuits, as long as 'no gaping divide has emerged in the jurisprudence' which would lead defendants 'reasonably to expect' the courts in this circuit to rule other than one way." *Id.* at 370–71 (citation omitted). "This is especially true if Supreme Court cases and relevant district court cases strongly indicate the asserted right is constitutionally protected." *Id.* (citations omitted).

In a First Amendment retaliation claim, "the qualified immunity issue revolves around whether the alleged act causing the [injury or] chill was clearly established as being unlawful" at the time of the incident.

*Rappa*, 991 F.Supp. at 374. *Rappa* states that "it is apparent that significantly adverse employment actions were clearly established as constituting retaliation if they were carried out in response to protected First Amendment activity." *Id.* at 375. Moreover, "the Supreme Court has most often found retaliation in cases in which the plaintiff's public employment has been denied in some way." *Id.* (citations omitted).

The Third Circuit points to the Supreme Court case of *Pickering v. Board of Education*, as establishing that "it is essential that public employees be able to speak out freely on questions of public concern without fear of retaliatory dismissal." *Pro v. Donatucci*, 81 F.3d 1283, 1287 (3d Cir. 1996) (citing *Watters v. City of Philadelphia*, 55 F.3d 886 (3d Cir.1995 ); *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). Furthermore, the Third Circuit acknowledges that "[i]n a line of cases beginning in the 1960's, the [Supreme] Court developed the principle that the government 'cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.' " *Id.* (citing *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)).

Therefore, this court finds that, in the present case, plaintiff's right to be free of retaliation for the exercise of her First Amendment right of free speech was clearly established. Nevertheless, there are factual disputes between the parties regarding the establishment of the underlying retaliation claim that must be resolved before this court can rule on the issue of qualified immunity. *Rappa*, 991 F.Supp. at 371; *Azzaro v. County of Allegheny*, 110

F.3d 968, 981 (3d Cir.1997). These factual disputes entail whether McCormick's complaint was a motivating factor in the decision not to renew her employment contract and whether McCormick would have been discharged for other reasons in the absence of her complaint. Accordingly, defendants' motion for summary judgment is denied.

### VI. Sovereign Immunity

Defendants argue that in their official capacities they are immune from plaintiff's state law claims pursuant to the doctrine of sovereign immunity according to the Eleventh Amendment in that "the State of Delaware has not consented to such a suit." *Wiers*, 925 F.Supp. at 1091. In addition, defendants cite *Will v. Michigan Department of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), for the proposition that plaintiff cannot sustain a 42 U.S.C. § 1983 claim against defendants in their official capacities.

■■■ Nevertheless, in her "Answering Brief" to defendants' motion for summary judgment, plaintiff points out that she has brought these claims against the defendants in their individual capacities, and, thus, sovereign immunity is not applicable as a defense. *Id.* (citing *Sample v. Diecks*, 885 F.2d 1099 (3d Cir.1989); *Winn v. Lynn*, 941 F.2d 236 (3d Cir.1991)). Therefore, no further consideration of this defense is necessary.

### VII. Statutory Immunity: Delaware Tort Claims Act

■■■ The defendants further argue that they are entitled to statutory immunity on McCormick's state law claims pursuant to the Delaware Tort Claims Act, 10 Del.C. § 4001 et seq.[18] "The Delaware Tort

---

18. The statute provides, in pertinent part:
 § 4001. Limitation on civil liability.
 Except as otherwise provided by the Constitution or laws of the United States or of any State ... no claim or cause of action shall arise, and no judgment, damages, penalties, costs or other money entitlement shall be awarded or assessed against the State or

any public officer or employee ... whether elected or appointed, and whether now or previously serving as such, in any civil suit or proceeding at law or in equity ... where the following elements are present:
 (1) The act or omission complained of arose out of and in connection with the performance of an official duty requiring a

Claims Act provides immunity for the State of Delaware and its officials and employees upon the fulfillment of three requirements." *Wiers,* 925 F.Supp. at 1091. "[P]ublic officials are exempt from suit under section 4001 when performing official duties involving the exercise of discretion and when performed in good faith and without gross or wanton negligence." *Smith v. New Castle County Vocational–Technical Sch. Dist.,* 574 F.Supp. 813, 821 (D.Del.1983). "Section 4001 also places on the plaintiff the burden of proving the absence of one or more of the elements of immunity set forth in the section." *Id.* at 820.

 Though defendants argue that they are entitled to summary judgment on McCormick's state law claims by virtue of this Act, "[t]he three elements required to demonstrate statutory immunity do not readily lend themselves to resolution by summary judgment." *Wiers,* 925 F.Supp. at 1092. "[F]actor two requires an inquiry into the subjective intent of the public officers." *Id.* Therefore, McCormick "has the burden to demonstrate the absence of good faith and of a belief that the public interest would be served by the officers' conduct." *Id.* (citing 10 Del.C. § 4001(2)).

Indeed, the court finds that McCormick has provided sufficient evidence which might allow the trier of fact to infer bad faith on the part of the defendants, including sworn testimony, medical evidence, circumstantial evidence pertaining to the timing and sequence of events, and direct evidence of comments by certain defendants. Therefore, the court finds that there are genuine issues of material fact for trial. *Id.* Accordingly, regarding

McCormick's state law claims, defendants motion for summary judgment based on the ground of statutory immunity is denied.

## VIII. Absolute Witness Immunity

 Defendants assert that they are entitled to absolute immunity regarding all "testimony defendants made at [plaintiff's] contract hearing." In support of this claim, defendants contend that the contract "hearing was conducted pursuant to 14 *Del.C.* § 121(4) with full trial rights and McCormick was represented by present counsel." At oral argument, plaintiff conceded that she may not seek liability of these defendants for their testimony at the hearing. Consequently, defendants motion for summary judgment based on the ground of absolute witness immunity is granted.

## IX. Collateral Estoppel and Res Judicata

### A. Collateral Estoppel and Res Judicata: General Principles

Defendants argue that all of plaintiff's claims relating to her employment are precluded by the doctrine of res judicata. Thus, defendants assert that plaintiff's claims under §§ 1983, 1985 and 1986, and state law, entailing claims of tortious interference with contract and negligent and intentional infliction of emotional distress, relating to plaintiff's former employment, should be precluded from any further adjudication. Moreover, defendants assert that to the extent plaintiff's claims are based on issues of fact that have been fully litigated through the contract renewal

determination of policy, the interpretation or enforcement of statutes, rules or regulations ... or any other official duty involving the exercise of discretion on the part of the public officer [or] employee ... ;
(2) The act or omission complained of was done in good faith and in the belief that the public interest would be best served thereby; and
(3) The act or omission complained of was done without gross or wanton negligence;

...
provided[ ] that in any civil action or proceeding against the State or a public officer [or] employee ... of the State, the plaintiff shall have the burden of proving the absence of 1 or more of the elements of immunity as set forth in this section.
*Wiers,* 925 F.Supp. at 1091–92 (quoting 10 *Del.C.* § 4001) (citation omitted).

hearing process and the state court appeal, these issues are barred from reconsideration by the doctrine of collateral estoppel.

As stated above, plaintiff appealed the results of her contract renewal hearing to the Superior Court in the matter of *McCormick v. Board of Education for the State of Delaware,* C.A. No. 97A–10–003, 1998 WL 960732 (Del.Super. July 22, 1998). The Superior Court opinion (1) addressed the issue of "whether a notice is effective if it is not served within the mandatory time limits set by 14 *Del.C.* § 121(4)[,]" *Id.* at 4, 1998 WL 960732; (2) held that the Board had violated the contractual provisions of the agreement by failure to adhere to the time limits causing prejudice to plaintiff, *Id.* at 7, 1998 WL 960732; (3) contained facts that McCormick had been employed under a series of contracts, had performed her job well, and her qualifications were never at issue, *Id.* at 2, 1998 WL 960732; and (4) included findings regarding "several additional errors" asserted by McCormick, *Id.* at 8–13, 1998 WL 960732. These allegations of additional errors were that "the Board failed to include its findings of fact in the September 18, 1997 Order; the Board accepted contradictory, biased testimony; the Board declined to admit evidence critical to [McCormick's] case; she was subject to disparate treatment and the Board's findings were not supported by substantial evidence." *Id.* at 8, 1998 WL 960732.

In its role as a reviewing court, the Superior Court's "sole function [was] to determine whether the Board's decision [was] supported by substantial evidence and free from legal error." The Superior Court held that "[s]ubstantial evidence exist[ed] to support a finding that the Department had 'just cause' to terminate McCormick because she violated the rules set out by it."[19] *Id.* at 12, 1998 WL 960732. Finally, the Superior Court found that "the evidence fully justifies the hearing officer's refusal to find that McCormick was subject to disparate treatment." *Id.* at 13, 1998 WL 960732.

Turning to the role of this court, "[a] federal court applying preclusion principles is bound by the Full Faith and Credit statute, 28 U.S.C. § 1738[20], and must give a prior state judgment the same effect as would the adjudicating state. The same results follow in section 1983 suits brought in federal courts." *Gregory v. Chehi,* 843 F.2d 111, 116 (3d Cir.1988) (citations omitted); *Kelley v. TYK Refractories Co.,* 860 F.2d 1188, 1192–93 (3d Cir.1988) (*citing Allen v. McCurry,* 449 U.S. 90, 101, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980)). "Decisions of state administrative agencies that have been reviewed by state courts are also given preclusive effect in federal courts." *Edmundson v. Borough of Kennett Square,* 4 F.3d 186, 189 (3d Cir.1993) (citing *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 479–85, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982)).

---

**19.** The Superior Court held that

> [t]he evidence adduced at the hearing if believed by the hearing officer shows that McCormick violated several of the Department's rules. On several occasions she conducted private business on state time; she failed to properly account for her time at different locations, in accordance with State and Federal regulations; and she improperly used State vehicles and the State's electronic mail system for personal business.

> *McCormick,* C.A. No. 97A–10–003 at 13, 1998 WL 960732.

**20.** 28 U.S.C. § 1738, in pertinent part, provides:

> The Acts of the legislature of any State, Territory, or Possession of the United States, or copies thereof, shall be authenticated by affixing the seal of such State, Territory or Possession thereto.
>
> . . .
>
> Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

## B. Delaware Law: Collateral Estoppel

According to Delaware law, "[u]nder the doctrine of collateral estoppel, if a court has decided an issue of fact necessary to its judgment, that decision precludes relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Messick v. Star Enterprise*, 655 A.2d 1209, 1211 (Del.1995) (citing *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980)). "Collateral estoppel extends not only to issues decided by courts, but also to issues decided by administrative agencies acting in a judicial capacity where the parties had an opportunity to litigate." *Id.* (citations omitted).

> Although the requirements for collateral estoppel[,] the preclusion of specific issues or facts[,] vary somewhat from those for res judicata, the courts require that the party against whom collateral estoppel is sought have an adequate opportunity to litigate its claims. The Supreme Court has defined this requirement as 'a fair opportunity procedurally, substantively and evidentially to pursue his claim the first time'.

*PIC Inc. v. The Prescon Corp.*, 485 F.Supp. 1302, 1308 (D.Del.1980) (quoting *Blonder–Tongue Laboratories v. University of Illinois Found.*, 402 U.S. 313, 333, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971)).

> Unlike res judicata the second litigation need not be the same cause of action as the first in order for collateral estoppel to result. The issue sought to be concluded must be the same as that involved, litigated and judicially determined in the prior action, and resolution of that issue must have been necessary to the judgment in the prior action.

*Id.* at 1308 n. 21 (citing 1B Jeremy C. Moore et al., *Moore's Federal Practice* ¶ 0.443(1)).

" 'The test for applying collateral estoppel requires that (1) a question of fact essential to the judgment, (2) be litigated and (3) determined (4) by a valid and final judgment.' " *Messick*, 655 A.2d at 1211 (citing *Taylor v. State*, 402 A.2d 373, 375 (Del.1979); *Tyndall v. Tyndall*, 238 A.2d 343, 346 (Del.1968)). "Delaware, like many other jurisdictions, has abandoned the requirement of mutuality as a prerequisite to the assertion of collateral estoppel." *Columbia Cas. Co. v. Playtex FP, Inc.*, 584 A.2d 1214, 1217 (Del.1991) (quoting *Chrysler Corp. v. New Castle County*, 464 A.2d 75, 79 (Del.Super.1983)). "Mutuality requires a party attempting to bar an adversary from relitigating an issue to have been a party in the prior litigation or in privity with a party in the prior litigation." *Id.* at 1216 (citation omitted). This concept has been abandoned, and now "[i]t is sufficient that the party against whom collateral estoppel is asserted was a previous party." *Id.* at 1217.

Applying the doctrine of issue preclusion regarding McCormick's employment contract-related claims—with respect to the ruling of the Board based on the recommendation of the hearing officer and the Superior Court decision upholding that ruling—issue preclusion prevents reexamination of the fact that plaintiff's contract was not renewed because of "misconduct in office, incompetency or willful neglect of duty, performing personal business on state time, improper use of a state vehicle and the state electronic system, and falsification of state documents." *McCormick*, C.A. No. 97A–10–003 at 12, 1998 WL 960732. Therefore, just cause was established pursuant to state law for the refusal to renew McCormick's contract. *Edmundson*, 4 F.3d at 189. "That determination, however, does not necessarily mean that plaintiff was in fact discharged solely for these reasons." *Id.*

In examining McCormick's claim that defendants' caused the termination of her employment contract in retaliation for the exercise of her right of free speech, this court must address the question whether the DPI would have terminated McCormick's employment even in the absence of plaintiff's remarks criticizing defendant

Jefferson. *Id.* (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). If this alternative explanation also had been adjudicated in the previous proceedings, then "issue preclusion would apply under both federal and Delaware law." *Id.* Nevertheless, the record before the court, reveals no indication that McCormick previously raised the First Amendment defense, thus issue preclusion cannot be based on the state law proceedings. *Id.* Moreover, there is no indication that McCormick's First Amendment retaliation claim was raised, litigated, and necessarily determined.

Consequently, the court finds that the doctrine of issue preclusion does not foreclose adjudication of plaintiff's First Amendment retaliation claim and her tortious interference with contract claim.[21] Therefore, defendants' motion for summary judgment based on the doctrine of collateral estoppel regarding these remaining claims is denied.

## C. Delaware Law: Res Judicata

■■■■ "Under the doctrine of res judicata, a final judgment on the merits rendered by a court of competent jurisdiction is, in the absence of fraud or collusion, an absolute bar to the maintenance of a second suit based on the same subject matter." *Hostetter v. Hartford Ins. Co.*, C.A. No. 85C–06–28, 1992 WL 179423, at *6 (Del.Super. July 13, 1992) (citing *Epstein v. Chatham Park*, 153 A.2d 180, 184 (Del.Super.1959)). The judicially formulated doctrine of res judicata entails a five pronged test:

"A. The original court must have had jurisdiction of the subject matter of the suit and of the parties to it; B. The parties to the original action were the same as the parties, or their privies, in the case at bar; C. The cause of action in the original action was the same as in

the case at bar, or the issues necessarily decided in the prior action were the same as those raised in the case at bar. D. The issues in the prior action were decided adversely to the contentions of the plaintiff in the case at bar. E. The decree rendered in the prior decree is a final decree." ·

*Rumsey Elec. Co. v. University of Delaware*, 334 A.2d 226, 228 (Del.Super.1975) (citing *Epstein*, 153 A.2d at 180).

In the instant case, the first, second, fourth, and fifth elements or prongs of the test under the doctrine of res judicata regarding the court's subject matter jurisdiction, privity, prior adverse decision, and finality of the previous decree are undisputed. Consequently, this first stage of the res judicata analysis must focus on the third element, i.e., the same cause of action or issues necessarily decided in the prior action resubmitted in the case at bar. In reviewing the findings of fact made by the hearing officer and later accepted by the Board of Education, it is evident that the decision focused exclusively on the actions of the plaintiff and her contractual relationship with her employer, the DPI. Though less explicit, but still evident and later confirmed on appeal, these findings of fact regarding the activities of the plaintiff were sufficient grounds to establish just cause for not renewing the plaintiff's contract with the DPI.

■■■ "Delaware subscribes to the modern transactional view of claim preclusion." *Meding v. Hurd*, 607 F.Supp. 1088, 1096 (D.Del.1985) (citing *Maldonado v. Flynn*, 417 A.2d 378, 381–82 (Del.Ch.1980); Restatement (Second) of Judgments 2d §§ 24–26 (1980)). "The modern transactional view of the doctrine of res judicata [or claim preclusion] ... does not require that the claim subsequently asserted be based on a same cause of action to be barred, but permits the doctrine to be

---

**21.** The plaintiff's First Amendment retaliation claim and her tortious interference with contract claims are the only remaining contract- related claims that have not been eliminated by granting defendants' motion for summary judgment in the previous sections.

invoked to bar litigation between the same parties if the claims in the later litigation arose from the same transaction that formed the basis of the prior adjudication." *Maldonado v. Flynn,* 417 A.2d 378, 381 (Del.Ch.1980) (citing *Ezzes v. Ackerman,* 234 A.2d 444 (Del.1967); *Steigman v. Beery,* 203 A.2d 463 (Del.Ch.1964); *Epstein v. Chatham Park, Inc.,* 153 A.2d 180 (Del.Super.1959)). "The determination, therefore, whether the doctrine shall be invoked is now based on the underlying transaction and not on the substantive legal theories or types of relief which are sought. Under the modern rule, ordinarily, a transaction gives rise to only one claim regardless of the number of ways that the claim may be asserted." *Id.* (citing Restatement (Second) of Judgments § 61, comments (b) & (c) (Tent. Draft No. 5 1978)).

 To determine the possible applicability of the doctrine of res judicata to the instant case, McCormick's "claim must therefore be analyzed in the light of the transaction which [she] challenges." *Id.* If her previous complaint before the hearing officer and Superior Court and her complaint before this court "assert different substantive theories concerning but one claim arising from but one transaction, the doctrine of res judicata may prohibit a second adjudication here." *Id.* Moreover, "[t]o determine, then, whether the plaintiff's present action against the defendant[s] ... is precluded by state law, requires a comparison of the operative facts underlying plaintiff's federal claims, and [her] prior state court action." *Meding,* 607 F.Supp. at 1096.

Defendants argue that the administrative and judicial processing of plaintiff's contract-related claims should bar plaintiff's federal claims related to her employment contract. Yet, plaintiff's federal contractual claims do not focus on plaintiff's activities and/or interaction with her employer that were later adjudged to be acts of misconduct. Rather, plaintiff's federal claims related to her employment contract focus on her interaction and/or relationship with the defendants and the alleged acts of the defendants which plaintiff asserts instigated the contract review and subsequent lack of renewal.

Accordingly, the court finds that the same transactions do not supply the grounds for the claims of the prior and subsequent suits, under the modern transactional view of claim preclusion. Therefore, the principles of the doctrine of res judicata do not support granting summary judgment on plaintiff's remaining employment contract-related claims of First Amendment retaliation and tortious interference with contract. Therefore, defendants' motion for summary judgment based on the doctrine of res judicata regarding plaintiff's First Amendment retaliation claim and her tortious interference with contract claim is denied.

## X. Additional Affirmative Defenses: State Law Claims

### A. Privilege and Justification of Self-Defense

 Defendant Jefferson asserts that his actions in allegedly assaulting McCormick are "privileged and not subject to liability." Jefferson argues that he was executing a valid arrest warrant on Lloyd, McCormick's father, while she was attempting to interfere. Consequently, defendant concludes that "[t]he use of such force is justified and privileged," citing 11 *Del.C.* §§ 462,[22] 467,[23] and *Moor v. Licciar-*

---

**22.** 11 *Del.C.* § 462, in pertinent part, provides:
> (a) Unless inconsistent with the ensuing sections of this Criminal Code defining justifiable use of physical force, or with some other provision of law, conduct which would otherwise constitute an offense is justifiable when it is required or authorized

by a provision of law or by a judicial decree, including:
> (1) Laws defining duties and functions of public officers;
> ...
> (b) The justification afforded by subsection (a) of this section applies when:

*dello,* 463 A.2d 268 (Del.1983). Moreover, Jefferson cites *Moor* for the proposition that the subjective test of 11 *Del.C.* § 464 [24] is to be applied to any claim of self-defense.

11 *Del.C.* § 467 governs the "use of force in law enforcement." One of the cases interpreting this provision, *State v. Mills,* 69 A. 841, 843 (Del.Super.1908), distinguishes the authority to act from acting in a lawful manner. The case held that "[a] peace officer may use whatever force is reasonably necessary to prevent the escape and secure the arrest of any person he may find engaged in a breach of the peace, or any criminal offense, or manifestly about to engage in such an offense; but he must use no more force and violence than is reasonably necessary to secure the arrest and to convey him to a place of custody." *Id.* at 843.

In addition, the court in the case of *Petit v. Colmary,* 55 A. 344, 345 (Del.Super.1903), held that

> [a]n officer in the discharge of a public duty, if attacked by another, may, no less than any other person, avail himself of the law of self–defense. He may, in defending himself, use such force as may be sufficient to repel the attack upon him; but for this purpose the force and resistance resorted to by him must be

no more than are necessary to protect himself from bodily harm. In addition to this force, if he be attacked by one whom he is endeavoring to arrest, or if interfered with by others in making the arrest, he may use all reasonable force necessary to effect the arrest.

The Delaware law of self-defense referenced above was discussed in the case cited by defendants, *Moor v. Licciardello.* There, the court stated that in 1973 the rule to be used to evaluate defendant's conduct regarding a claim of self-defense was changed from a reasonable man, objective test, to a subjective test, i.e., "a person's conduct must be analyzed from the standpoint of his subjective belief." *Id.* at 270–71 (citing *Coleman v. State,* 320 A.2d 740 (Del.1974)). Though this passage described a change in the Delaware criminal code, 11 *Del.C.* § 464, the court noted that "[t]he substance of a claim of self-defense is the same in both criminal and civil litigation; only the burden of proof differs." *Id.* at 272 (citation omitted). The court then held that "[s]ince the legislature has enacted a change in the law in regard to self-defense as it may come up in criminal proceedings, a corresponding change was effected in regard to civil claims where self-defense is a factor." *Id.* Citing,

> (1) The defendant's conduct is required or authorized by the judgment or order of a competent court or tribunal or in the lawful execution of legal process, notwithstanding lack of jurisdiction of the court or defect in the legal process. . . .

**23.** 11 *Del.C.* § 467, in pertinent part, provides:

> (a) The use of force upon or toward the person of another is justifiable when the defendant is making or assisting in making an arrest and believes that such force is immediately necessary to effect the arrest.
> . . .
> (e) The use of force upon or toward the person of another is justifiable when the defendant believes that such force is immediately necessary to prevent such other person from committing suicide, inflicting serious physical injury upon the person's self or committing a crime involving or threaten-

> ing physical injury, damage to or loss of property or a breach of the peace. . . .

**24.** 11 *Del.C.* § 464, Use of force in self-protection, provides, in pertinent part:

> (a) The use of force upon or toward another person is justifiable when the defendant believes that such force is immediately necessary for the purpose of protecting the defendant against the use of unlawful force by the other person on the present occasion.
> (b) Except as otherwise provided in subsections (d) and (e) of this section, a person employing protective force may estimate the necessity thereof under the circumstances as the person believes them to be when the force is used, without retreating, surrendering possession, doing any other act which the person has no legal duty to do or abstaining from any lawful action. . . .

inter alia, 11 *Del.C.* § 307(a),[25] the *Moor* court stated that "[a]n appraisal from the reasonable man standpoint is retained only as a factor in evaluating the credibility of the defendant's belief." *Id.* at 271.

Similarly, the case of *Coleman v. State,* 320 A.2d 740, 743 (Del.1974) (emphasis added), stated:

> the new Criminal Code has changed the standard to be applied by the trier of fact in determining the issue of justification. The former objective test of what a reasonable man would have believed under the circumstances, *as to the necessity of using force in self-defense,* has been supplanted by the subjective test of what the defendant *actually believed as to such necessity.* In applying the subjective standard and in testing the defendant's actual belief as to the necessity of force for self-protection, it is important to note that s 307(a) of the new Code provides that 'the jury may consider whether a reasonable man in the defendant's circumstances at the time of the offense would have had or lacked the requisite belief.' Thus, the 'reasonable man' test is retained as a factor to be considered with all others in the determination of the issue of justification; but it is not necessarily the controlling factor as heretofore.

Though Delaware law requires the fact finder to use a subjective test to evaluate the defendant's decision to use force in self

defense, in order for an officer to avail himself of the qualified privilege to use force, he is limited in the amount of force he can use to that reasonably necessary in the circumstances. Therefore, notwithstanding the use of the subjective test, a credibility determination must be made as to the reasonableness of defendant's subjective belief.

In the case at bar, plaintiff argues, in response to defendant's claims of privilege as a law enforcement officer and the justification of self-defense, that "Jefferson's conduct [outside the Bridgeville Police Station] was neither required nor authorized by law, nor could he reasonably have believed that his use of force was necessary under the circumstances." Consequently, there is a dispute as to a material fact regarding the reasonableness of Jefferson's subjective belief in allegedly using force against plaintiff. Therefore, defendant Jefferson's motion for summary judgment based on the defense of privilege and the justification of self-defense is denied.

## B. The Exclusivity Provision of Delaware's Workers' Compensation Act

Defendants argue that all plaintiff's state law claims are barred by the exclusivity provision of the Delaware Workers' Compensation Act. Specifically, defendants cite to the "coemployee immunity-from-suit" provision of the Act at 11 *Del.C.* § 2363(a).[26] In support of this argu-

---

**25.** 11 *Del.C.* § 307(a), Jury inference of defendant's intention, recklessness, knowledge or belief, provides:

(a) The defendant's intention, recklessness, knowledge or belief at the time of the offense for which the defendant is charged may be inferred by the jury from the circumstances surrounding the act the defendant is alleged to have done. In making the inference permitted by this section, the jury may consider whether a reasonable person in the defendant's circumstances at the time of the offense would have had or lacked the requisite intention, recklessness, knowledge or belief.

**26.** 19 *Del.C.* § 2363(a) provides:
§ 2363 Third person liable for injury; right of employee to sue and seek compen-

sation; right of employer and insurer to enforce liability; notice of action; settlement and release of claim and effect thereof; amount of recovery; reimbursement of employer or insurer; expenses of recovery; apportionment; compensation benefits.

(a) Where the injury for which compensation is payable under this chapter was caused under circumstances creating a legal liability in some person other than a natural person in the same employ or the employer to pay damages in respect thereof, the acceptance of compensation benefits or the taking of proceedings to enforce compensation payments shall not act as an election of remedies, but such injured employee or the employee's dependents or their personal representative may also pro-

ment, defendants assert that it is indisputable that defendants and plaintiff were all employees of the State of Delaware and that defendants were within the scope of their employment when the alleged incidents took place. Therefore, defendants contend that plaintiff's exclusive remedy for her state law claims is provided by the Workers' Compensation Act.

In response, plaintiff asserts that the "personal dispute exception" of 19 *Del.C.* § 2301(15)(b)[27] applies to the case at bar, excluding the matter from coverage under the Workers' Compensation Act. Given its potentially dispositive nature, the court first will address the issue whether the "personal dispute exception" of 19 *Del.C.* § 2301(15)(b) applies here.

"Reading 19 *Del.C.* §§ 2304[28] and 2363(a) together, in general, suit may not be brought by one employee against another employee of the same employer for damages for a condition which is compensable under the Worke[rs'] Compensation Law." *Ward v. General Motors*, 431 A.2d 1277, 1279 (Del.Super.1981) (citing *Groves v. Marvel*, 213 A.2d 853 (Del.1965); *Dickinson v. Eastern R.R. Builders*, 378 A.2d 650 (Del.Super.1977), *rev'd on other grounds*, 403 A.2d 717 (Del.1978)). Nevertheless, pursuant to 19 *Del.C.*

§ 2301(15)(b), "personal injury is excluded from the coverage of the Worke[rs'] Compensation Act where the injury was caused by the act of another employee whose act was 'willful,' and whose act was directed against the injured employee 'by reasons personal to such employee and not directed against him as an employee or because of his employment.'" *Id.* "In order for conduct to be willful there must be an actual intent to produce a result." *Id.* at 1280 (citing *Law v. Gallegher*, 197 A. 479 (Del.1938)). The act must have been done intentionally, knowingly and purposely. *Id.* (citing *Lobdell Car Wheel Co. v. Subielski*, 125 A. 462 (Del.Super.1924)).

Under 19 *Del.C.* § 2301(15), in considering whether the actions of defendants were directed at plaintiff for personal reasons it must be determined "whether the motivation or causation of the [defendants acts were] founded on reasons which were personal between [them]." *Id.* "While a condition or feeling may exist on the part of both parties, . . . mutuality is [not] required." *Id.* "Ordinarily, the [c]ourt will examine the reasons of the wrongdoer to determine whether the [acts were] motivated or caused by personal reasons." *Id.* at 1280–81.

**27.** 19 *Del.C.* § 2301(15)(b) provides:

(15) "Personal injury sustained by accident arising out of and in the course of the employment":
b. Shall not include any injury caused by the wilful act of another employee directed against the employee by reasons personal to such employee and not directed against the employee as an employee or because of the employee's employment.

**28.** 19 *Del.C* § 2304 Compensation as exclusive remedy provides:

Every employer and employee, adult and minor, except as expressly excluded in this chapter, shall be bound by this chapter respectively to pay and to accept compensation for personal injury or death by accident arising out of and in the course of employment, regardless of the question of negligence and to the exclusion of all other rights and remedies.

ceed to enforce the liability of such third party for damages in accordance with this section. If the injured employee or the employee's dependents or personal representative does not commence such action within 260 days after the occurrence of the personal injury, then the employer or its compensation insurance carrier may, within the period of time for the commencement of actions prescribed by statute, enforce the liability of such other person in the name of that person. Not less than 30 days before the commencement of suit by any party under this section, such party shall notify, by registered mail at their last known address, the Industrial Accident Board, the injured employee or, in the event of the employee's death, the employee's known dependents or personal representative or the employee's known next of kin, the employee's employer and the workers' compensation insurance carrier. Any party in interest shall have a right to join in said suit.

The analysis, to determine whether or not defendants engaged in the alleged activities within the course of their employment when the alleged events took place, has been summarized as follows:

> our courts generally look to the time, place, and circumstances of the injury, with a focus on three factors: (1) the employee's act causing the injury was willful; (2) the injury must not have been directed against plaintiff as an employee or because of plaintiff's employment; and (3) the assault was directed against the plaintiff because of personal reasons. The first factor is relatively straightforward; the second and third, which appear to overlap to some degree, examine the alleged tortfeasor's motivations and involve a consideration of four different elements: (1) whether the employee's actions were necessary or related to the duties of the job; (2) whether the duties of either party required them to work together or to be in close proximity or to communicate with each other; (3) whether the incident was generated or stimulated by duties, assignments, or conditions of work; and (4) whether the incident resulted from the fact that plaintiff was an employee of this particular employer.

*Dockham v. Miller,* No. 95C–02–091–WTQ, 1997 WL 817873, at *3 (Del.Super. May 21, 1997) (citing *Ward,* 431 A.2d at 1280; *Staker v. Willard,* C.A. No. 80C–SE–15 (Del.Super.1984)).

The application of this analysis to the facts in this case militates against concluding that defendants' are entitled to summary judgment. There are various issues of material fact that remain unresolved. Generally, McCormick's state law claims, as with all of her claims, are based on her assertion that she was assaulted, battered, and wrongfully detained by defendant Jefferson pursuant to a conspiracy by all the defendants and that defendants caused her employment contract not to be renewed. For the personal dispute exception of 19 *Del.C.* § 2301(15)(b) to apply, the acts of the defendants must have been willful or intentional. At this stage of the litigation,

McCormick has established sufficient evidence to allow a reasonable inference in her favor that defendants' acted intentionally, thereby creating a genuine issue of material fact precluding summary judgment in favor of the defendants.

In addition, the remaining two factors, whether or not the injury was "directed against plaintiff as an employee or out of plaintiff's employment" and whether or not the injury was "directed against the plaintiff for personal reasons," are disputed between the parties. Nevertheless, plaintiff has produced sufficient evidence so that, if believed, a trier of fact could conclude that defendants actions were motivated out of personal animosity toward plaintiff due to her complaint to defendants' upper management.

Moreover, as stated above, the second and third factors, in examining the alleged motives of the defendants, involve the application of four elements to the underlying facts in the case at bar. Again, consideration of these factors militate against granting summary judgment to the defendants. "In *Ward,* [the court] specifically rejected the idea that 'the mere fact that the setting for injury was the time and place of employment renders the employment as a cause of the injury.'" *Dockham,* 1997 WL 817873 at *4 (citing *Ward,* 431 A.2d at 1280). Further, it is clear from the record that the duties of the parties did not require them to work together, communicate with each other, or be in close proximity to each other. *Ward,* 431 A.2d. at 1280–81. Additionally, it is questionable whether "defendant[s] attitude toward plaintiff was generated or stimulated by duties or assignments or conditions of work, or by the fact that plaintiff was an employee of [the State of Delaware] and whether defendant[s'] actions were necessary or related to the duties of [their] job[s]." *Id.* At minimum, plaintiff has produced sufficient evidence as to defendants' motivation to present a genuine issue of material fact for trial.

In summary, the issues of whether defendants' acts were willful, whether these

acts caused plaintiff injury, whether these acts were directed at plaintiff due to defendants' personal animosity towards McCormick verses her state employee status or employment duties are unresolved and their underlying facts disputed. *Dockham v. Miller,* No 95C–02–091–WTR, 1997 WL 528090, at *4 (Del.Super. June 12, 1997). Therefore, defendants' motion for summary judgment based on the exclusivity provision of Delaware's Workers' Compensation Act must be denied.[29]

## CONCLUSION [30]

For the reasons set forth above, the court finds as follows: according to a stipulation between the parties, pursuant to Fed.R.Civ.P. 41(a)(1), all claims of plaintiff Lloyd are dismissed. Defendants' motion for summary judgment is denied in part and granted in part. Defendant Jefferson's motion for summary judgment on McCormick's Fourth Amendment excessive force claim is denied. Defendant Jefferson's motion for summary judgment on McCormick's Fourteenth Amendment excessive force claim is granted. Defendants' motion for summary judgment on McCormick's Fourteenth Amendment due process claim is granted. Defendants' motion for summary judgment on McCormick's First Amendment retaliation claim is denied. Defendants' motion for summary judgment on McCormick's Fourteenth Amendment equal protection claim is granted. Defendants' motion for summary judgment on McCormick's constitutional claims pursuant to 42 U.S.C. §§ 1985 and 1986 is granted. Defendant Jefferson's motion for summary judgment on McCormick's claim of assault and battery is denied. Defendant Jefferson's motion for summary judgment on McCormick's claim of false imprisonment is granted. Defendants' motion for summary judgment on McCormick's claim of intentional or reckless infliction of emotional distress is granted. Defendants' motion for summary judgment on McCormick's claim of negligent infliction of emotional distress is granted. Defendants' motion for summary judgment on McCormick's tortious interference with contract claim is denied. Defendants' motion for summary judgment based on the defense of sovereign immunity was excluded from consideration upon plaintiff McCormick's assertion that defendants were not sued in their official capacities. Defendants' motion for summary judgment based on the defense of qualified immunity on McCormick's remaining constitutional claims of Fourth Amendment excessive force and First

**29.** The following excerpt from the case, *Dockham v. Miller,* 1997 WL 528090 at *4 n. 4, should address the assertions of both parties regarding the applicability of a case cited by both parties at different stages in its procedural posture:

Defendant's reliance upon *Konstantopoulos v. Westvaco Corp.,* 690 A.2d 936 (Del.1996) is questionable. The certified question before the Supreme Court concerned the reach of § 2301(15)b, and to the extent that the reach of § 2301(15)b is applicable to questions concerning the definition of 'person in the same employ' under § 2363, the Court's analysis on this point might be instructive. However, there are at least two factors that appear to make reliance upon *Konstantopoulos* problematic in this case. First, the plaintiff was seeking to sue her employer, not her co-employee, after having already accepted workers' compensation benefits.... [T]he Supreme Court specifically noted that the facts relating to the certified question assumed that the conduct arose out of and in the course of employment. *Id.* at 939. As a result, the Court stated that it did not need to consider the exception contained in § 2301(15)b. *Id.* (stating "[t]he personal dispute exception, however, has no bearing on the issues presented in the certified questions").

**30.** McCormick seeks punitive damages in connection with both her federal and state law claims. The standard which must be met for punitive damages arising out of federal claims is different from that of state claims. *Wiers,* 925 F.Supp. at 1094. Nevertheless, though defendants' motion for summary judgment seeks entry of judgment on all plaintiff's claims "for the reasons set forth in the briefs," neither brief addresses plaintiff's damage—related claims. Consequently, a discussion of these claims is not included in this Opinion.

Amendment retaliation is denied, pending resolution of the material factual disputes associated with the establishment of these claims. Defendants' motion for summary judgment based on the defense of statutory immunity pursuant to the Delaware Tort Claims Act on plaintiff McCormick's remaining state law claims of assault and battery and tortious interference with contract is denied. Defendants Jefferson and McDaniels' motion for summary judgment based on the assertion of absolute witness immunity regarding their testimony at McCormick's employment contract hearing is granted. Defendants' motion for summary judgment based on the doctrines of collateral estoppel and res judicata on McCormick's remaining employment contract—related claims of First Amendment retaliation and tortious interference with contract is denied. Defendant Jefferson's motion for summary judgment based on the defense of privilege on McCormick's assault and battery claim is denied. Defendants' motion for summary judgment based on the exclusivity provision of Delaware's Workers' Compensation Act on McCormick's remaining state law claims is denied. An appropriate order shall issue.